540 F.2d 27
 Fed. Sec. L. Rep. P 95,660
Gerald L. HERZFELD, Plaintiff-Appellee,
v.
LAVENTHOL, KREKSTEIN, HORWATH & HORWATH, Defendant-Appellant.
LAVENTHOL, KREKSTEIN, HORWATH & HORWATH, Third-Party
Plaintiff-Appellee,
v.
ALLEN & COMPANY, INCORPORATED and Allen & Co., Third-Party
Defendants-Appellants.
ALLEN & COMPANY, INCORPORATED and Allen & Company,
Third-Party Counterclaimants-Appellants,
v.
LAVENTHOL, KREKSTEIN, HORWATH & HORWATH, Third-Party
Counterclaim Respondent-Appellee.
 Nos. 58, 59, Dockets 74-2405, 74-2505.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 20, 1975.
Decided July 15, 1976.
 
 Louis Haimoff, New York City (Blum, Haimoff, Gerson, Lipson & Szabad, New York City, of counsel), for plaintiff-appellee.
 Louis A. Craco, New York City (Jack David, Patricia Anne Williams, Rebecca T. Halbrook, Willkie, Farr & Gallagher, New York City, of counsel), for defendant-appellant and third-party counterclaim respondent-appellee.
 Daniel A. Pollack, New York City (Martin I. Kaminsky, Richard M. Asche, Pollack & Singer, New York City, of counsel), for third-party defendants-appellants, and third-party counterclaimants-appellants.
 Before MOORE and TIMBERS, Circuit Judges, and COFFRIN* District Judge.
 MOORE, Circuit Judge:
 
 
 1
 Laventhol, Krekstein, Horwath & Horwath, a firm of certified public accountants ("Laventhol"), appeals from an amended judgment for the amount of $153,000, entered against it and in favor of plaintiff, Gerald L. Herzfeld ("Herzfeld") after a trial to the Court. Allen & Company and Allen & Company, Incorporated (referred to collectively as "Allen") appeal from that portion of the judgment which awarded Laventhol contribution against them and which dismissed their counterclaims against Laventhol. The opinion of the lower court is reported at 378 F.Supp. 112 (S.D.N.Y.1974) (MacMahon, J.). We affirm the Herzfeld award and the dismissal of the Allen counterclaims. We reverse the Laventhol contribution award against Allen, and dismiss Laventhol's third-party contribution complaint.
 
 
 2
 Originally, Herzfeld had sued Laventhol and eleven other defendants[1] primarily to recover $510,000 which he claimed that he had paid for certain securities of Firestone Group, Ltd. ("FGL"), namely, two FGL units, each unit consisting of a $250,000 FGL note and 5000 shares of FGL stock at $1 a share, a total of $255,000 per unit. The substance of Herzfeld's charges was that the representations made to him by the defendants in connection with the purchase were materially misleading and that there were omissions of material facts, all of which were inducing factors, and on which he relied, in making his purchase and in not exercising his right of rescission. Herzfeld predicated his suit upon alleged violations of the securities laws of the United States,[2] Section 352-c of the New York General Business Law and common law fraud.
 
 
 3
 That suit was settled by all defendants except Laventhol for $357,000. Thereafter, by an amended complaint, Herzfeld sought to recoup the balance ($153,000) of the $510,000 from Laventhol. Laventhol thereupon, as a third-party plaintiff, sued nine settling defendants to recover, by way of contribution, a portion of such amount, costs and attorneys' fees for which it might be liable in the new Herzfeld suit. In their answer, Allen asserted counterclaims against Laventhol.
 
 
 4
 The specific facts are particularly important in determining the rights of the parties, Herzfeld, Laventhol and Allen, and are best developed in chronological order.
 
 
 5
 FGL was a California company engaged principally in the business of purchasing real estate and thereafter syndicating or reselling it. In November 1969, FGL planned to raise $7,500,000 by the private placement through Allen and Company, Incorporated, of the aforementioned units. Lee Meyer, a defendant, was an Allen vice-president and also a FGL director.
 
 
 6
 Through friends, Herzfeld became interested in the venture. A purchase agreement, entitled "Note and Stock Purchase Agreement", dated November 10, 1969, was delivered to Herzfeld by FGL with an accompanying letter which advised him that the closing date for the sale of the notes would be December 16, 1969, "to permit the preparation of audited financial statements, as at and for the eleven months ended November 30, 1969, copies of which will be delivered to you." The letter added that these "audited statements will serve as the basis for confirming the unaudited Projected Financial Statements annexed to the Note and Stock Purchase Agreement as Exhibit B."
 
 
 7
 Exhibit B was a balance sheet and income statement. It portrayed FGL as a strikingly profitable corporation with over $20 million in assets, a net worth of close to a million dollars, sales of over $17 million, deferred income of.$2.7 million and an after-tax income of $315,000. FGL warranted that it fairly presented its financial condition as at November 30, 1969.
 
 
 8
 Herzfeld read the entire income statement and the balance sheet and noted that it represented FGL as being very profitable, with earnings of approximately $2 a share for the period ending November 30, 1969. He then signed the agreement to purchase two units thereunder.
 
 
 9
 To prepare the promised audit (to be as of November 30, 1969), FGL retained Laventhol as the accountants for the task. The Herzfeld-Laventhol lawsuit and this appeal therefrom involve only the deeds and alleged misdeeds of Laventhol in making its audit which was submitted to FGL and thereafter to the security purchasers, including Herzfeld. However, the third-party claim and cross-claims, hereinafter referred to, necessitate a review of the activities of Allen in the transaction.
 
 
 10
 The spotlight of Herzfeld's claim of a materially misleading audit, knowingly made with admitted awareness of the facts, focuses upon Laventhol's accounting treatment of two real estate transactions in which FGL allegedly engaged in late November 1969, referred to herein as the FGL-Monterey purchase and the FGL-Continental sale. Purporting to reflect these transactions are two agreements. Each agreement is on an identical printed form entitled "AGREEMENT FOR SALE OF REAL ESTATE" and certain typewritten provisions have been inserted therein.[3] The first is dated November 22, 1969 and is between Monterey Nursing Inns, Inc. ("Monterey") as seller and FGL as buyer. The transaction was subject to two conditions: (1) the buyer's approval of a preliminary title report and CC&R's[4] of Record on each property (there is no evidence that any such documents were ever prepared, delivered or approved); and (2) execution of a NNN lease per terms of "Exhibit D attached hereto" (no such exhibit appears to have been attached). Twenty-three (23) nursing homes were the subject of the sale "as per Exhibit 'A' attached hereto" (no such exhibit appears to have been attached). The purchase price is stated as $13,362,500, $5,000 of which was payable before November 30, 1969 (i. e., upon the signing of the contract).
 
 
 11
 On an identical printed form with almost identical typewritten inserts is an agreement by FGL as seller to sell to Continental Recreation Company, Ltd. ("Continental") as buyer. Again, there is no Exhibit A listing the properties. The purchase price is stated as $15,393,000 with $25,000 as a down payment, other payments to be made in 1970 and thereafter.
 
 
 12
 This purchase and sale of nursing homes, if ever consummated, would have been the largest single transaction in the history of FGL. Placing these two purported agreements side by side, if the obligations therein were ever fulfilled in the future, FGL would have bought Monterey for $113,362,500 and sold it for $15,393,000, thus producing a profit, when, as and if the transactions were consummated, of $2,030,500, no part of which was even contemplated as having been received prior to November 30, 1969, and only payments of $5000 by FGL to Monterey and $25,000 from Continental to FGL may have been made.
 
 
 13
 A comparison of the financial condition of FGL with and without these transactions demonstrates the importance of them to FGL:
 
 
 14
 Monterey Monterey
 Included Excluded
Sales .................. $22,132,607 $6,739,607
Total Current Assets ..... 6,290,987 1,300,737
Net Income .................. 66,000 (169,000)
Deferred Profit .......... 1,795,000 -0-
Earnings/Share ............... $0.10 (0.25)
 
 
 15
 Thus, the accounting treatment of these transactions determined the health of FGL's financial picture. Laventhol knew this was so. By this treatment, namely, immediate recognition of a so-called profit, Laventhol notes, dated November 30, 1969, reveal the conversion of estimated $772,108 losses into a $1,257,892 gain by the addition of the $2,030,500 "profit". These work papers contain the following entries:
 
 
 16
 "Estimated loss 4 months ended
 4/30/69 ......................... 200,000
 Estimated loss 7 months ended
 11/30/69 ........................ 572,108
 Loss before sale to Continental
 Recreation ...................... 772,108
 Profit on sale to Continental
 Recreation ...................... 2,030,000 (sic)
 ----------
 Profit before income taxes ....... 1,257,892" (sic)
 
 
 17
 Little wonder that when at the outset a Laventhol partner was discussing the situation from an accounting standpoint, he referred to it as a "fictitious or proposed or artificial transaction." Appendix ("App.") p. 887. But Laventhol undertook the task, albeit it had to engage in considerable soul-searching during it. Laventhol also learned that Monterey transactions were nowhere recorded in the FGL books and that there were no corporate minutes or resolutions approving or even adverting to the transactions. The absence was remedied by Laventhol, who prepared adjusting entries and ordered the FGL controller to enter them in the FGL books. Illustrative is the letter from Laventhol's audit manager to FGL's controller enclosing "the journal entries which we generated for the financial statements at November 30" (emphasis added). These very entries were prepared by Laventhol as if the transaction had been consummated: yet the agreements on their face showed that no profits could result therefrom until long after November 30.
 
 
 18
 Under date of November 30, 1969, appears as a general journal entry (Journal No. 9) an item "Profit on sale $2,030,500" and also a credit of $3,995,000 "to record purchase and sale of various hospitals from Monterey . . .". A further Laventhol paper, dated December 6, 1969, reverses a tax liability entry on the Continental sale which reads that Laventhol "will not record as sale since not enough deposit was given to Firestone".
 
 
 19
 The November 22 and 26 contracts came to Laventhol's attention on or about December 1st through its partners, Chazen and Lipkin, and Schwabb, the audit manager. Schwabb sought Lipkin's advice about the proper way to report the transactions in the audit. Lipkin sought to gather the pertinent information by meeting with Scott, a FGL vice-president, and Firestone. Scott told him that FGL was busy acquiring the necessary documentation. Firestone said that the agreements were legitimate and described Continental's principal, Max Ruderian, as an experienced real estate operator and a wealthy individual. Laventhol learned that Continental had a net worth of $100,000 and that its assets consisted of "miniature golf courses plus other assets". Ruderian's business practice was to "buy and resell prior to final payment on his sales contracts".
 
 
 20
 Lipkin also examined the sales contracts. He was an attorney but had only practiced one year. He concluded that the contracts were legally enforcible. He consulted another Laventhol partner who assured him that there need be no concern about Ruderian. Ruderian's references concurred in the appraisal.
 
 
 21
 Lipkin also consulted over the telephone with a Los Angeles attorney. The attorney did not see the contracts, nor were the contracts in their entirety read to him, despite the fact that his offices were only one-half hour away by cab. Nevertheless, the attorney gave a telephone opinion that they were valid and enforcible.
 
 
 22
 The first tangible results of Laventhol's accounting efforts appear in its audit enclosed in its letter to FGL, dated December 6, 1969. In the consolidated balance sheet as of November 30, 1969, the amount of $1,795,500 was recorded "as unrealized gross profit". The same characterization was given to this assumed profit in the income statement with a reference to an explanatory Note 4. This Note only explained the $1,795,500 by stating that "because of the circumstances and nature of the transactions, $1,795,500 of the gross profit thereon will be considered realized when the January 30, 1970 payment is received." The $1,795,500 was apparently arrived at by first adding the $25,000 paid upon execution of the Continental agreement, the $25,000 not yet due (until January 2, 1970) and $185,000 a liquidated damage figure for non-performance. These amounts totalled $235,000. They were apparently considered as received and were deducted from the then fictitious profit of $2,030,500, resulting in the figure of $1,795,500. This first December 6, 1969 report is marked "Withdrawn & Superseded".
 
 
 23
 The reason for the withdrawal is found in the testimony that FGL wanted the audit to reflect the entire amount of $2,030,500 as pre-November 30, 1969, income resulting from a sale by FGL to Continental. On December 4, 1969, Chazen and Lipkin met with FGL officers. Firestone objected to the tentative accounting treatment of the Monterey transactions, and FGL threatened to withdraw its account and sue Laventhol if the private financing did not go through.
 
 
 24
 A second report (also dated December 6, 1969) was then submitted by Laventhol. In the income statement "unrealized gross profits (Note 4)" was changed to "Deferred gross profit (Note 4)" and Note 4, itself to read:
 
 
 25
 "Of the total gross profit of $2,030,500, $235,000 is included in the Consolidated Income Statement and the balance $1,795,500 will be considered realized when the January 30, 1970 payment is received. The latter amount is included in deferred income in the consolidated balance sheet."
 
 
 26
 It was this second report which was distributed to the investors, including Herzfeld.
 
 
 27
 Unlike the initial report, the opinion letter accompanying this second and final report was qualified. It stated:
 
 
 28
 "In our opinion, subject to collectibility of the balance receivable on the contract of sale (see Note 4 of Notes to Financial Statements) the accompanying consolidated balance sheet and related consolidated statements of income and retained earnings present fairly the financial position of (FGL) . . .."
 
 
 29
 Recognizing the difference between the financial statements (Exhibit B to the purchase agreement of November 10, 1969) and the Laventhol audit (December 6, 1969) submitted to Herzfeld and others, on December 16, 1969, FGL attempted to explain by a letter of that date the shift of $1,795,500 from a current to a deferred basis. The financial statements and the qualified opinion letter accompanied the FGL letter which purported to "explain" the distinctions between unaudited projections originally contained in the Agreement and Laventhol's report. No claim is made that Laventhol in any way participated in, or was responsible for, this FGL letter.
 
 The FGL letter reads:
 
 30
 "One transaction which is reflected in the November 30 audited financial statements has been treated as producing deferred gross profit rather than current gross profit. While the combination of current and deferred income is actually higher than projected ($1,411,557 as compared with $1,360,000 projected) the shift of $1,795,500 of gross profit on this transaction from a current basis to deferred basis by the auditors has reduced current net income below that originally projected. . .
 
 
 31
 Deferred income shown on the audited balance sheet has been increased to $2,834,133 as against $1,421,000 projected. A breakdown of the components of the deferred income account is shown in the audited financial statements. . . ..
 
 
 32
 If for any reason you find that the changes reflected in the audited financial statements are of a nature which would have resulted in a change in your investment decision, we will arrange to promptly refund to you your subscription payment. . . .
 
 
 33
 Allen & Company will undertake to replace any cancelled subscriptions with others on the same terms and conditions so that in any event the Firestone Group, Ltd. will have available to it the proceeds from the sale of at least 25 units.
 
 
 34
 Herzfeld read this letter outlining the differences, the "Consolidated Statement of Income and Retained Earnings" and noted the deferred gross profit item of $1,795,500. He did not read the Laventhol opinion letter or Note 4. Apparently, relying on what he had seen, he was satisfied with his investment and did not take advantage of the rescission offer.
 
 
 35
 Neither the Monterey nor the Continental transactions were consummated and somewhat over a year later FGL filed a petition under Chapter XI of the Bankruptcy Act. A 10% dividend was eventually paid. This 10% payment was included in the $357,000 Allen settlement, leaving a balance of $153,000 unpaid on Herzfeld's original investment, for which, by this suit, he claims that Laventhol, because of its materially misleading audit, is responsible.
 
 
 36
 The Trial Court first considered Herzfeld's claim under § 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 thereunder. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.[5] The Court found that "Laventhol knew that its audited report was required for the FGL private placement and that investors would be relying on the financial statements"; that Laventhol had access to information concerning FGL which was not available to investors. As to Laventhol's legal duty, the Court held that it was the policy of the securities laws that investors be provided "with all the facts needed to make intelligent investment decisions (which) can only be accomplished if financial statements fully and fairly portray the actual financial condition of the company." 378 F.Supp. at 122.
 
 
 37
 After analyzing the facts, the Court concluded that "the Laventhol report was materially misleading." Id. at p. 124. The Court found that Note 4, claimed by Laventhol to be fully explanatory, was misleading: (1) in not disclosing that Continental, obligated to pay almost $5,000,000, had assets of only some $100,000; (2) in affirmatively stating that FGL had "acquired" the nursing homes (when it had not); (3) in reporting that $1,795,500 was deferred income; and (4) in stating that there was a lease back (when apparently no such lease existed). The Court's conclusion was that "the inclusion of the Monterey transaction in sales and income was misleading without a full disclosure by Laventhol of all the material facts about the transactions." Id. at p. 125.
 
 
 38
 Examining the report as a whole, the Court also found ten materially misleading omissions in Laventhol's failure to disclose (1) Continental's net worth; (2) the printed form language which suggested that they were mere options; (3) the absence of Ruderian's personal liability; (4) Ruderian's practice of reselling property before he paid for it; (5) the absence of any records of the Monterey transactions in FGL books; (6) the relative importance of the contracts; (7) the loss FGL would suffer if the sales fell through; (8) the absence of any title search; (9) that FGL had not acquired title; and (10) that the attorney ventured his opinion about the enforcibility of the contract without having examined the printed forms.
 
 
 39
 The Court held that Laventhol had the necessary scienter (merely the Latin adverb for "knowingly"), namely, "knowledge of the fact that the figures created a false picture . . .", and in addition, that Laventhol "had actual knowledge of the omitted facts which render(ed) its report misleading." Id. at p. 127. In light of Laventhol's concession that it was actually aware of the facts which the Trial Court correctly determined made Laventhol's affirmations misleading, we need not dwell upon the particular evidentiary items which the Court invoked to supplement its rationale.
 
 
 40
 The Laventhol report, if not the original inducing factor for the purchase, was read by Herzfeld. The Court therefore concluded that "The report's false picture of FGL's financial condition was, thus, a substantial, even crucial, factor in convincing Herzfeld that his investment decision to purchase the securities was right," Id. at p. 129, and that Herzfeld had shown sufficient reliance thereon. Characterizing the case as one of affirmative misrepresentations, the Court held that the correct test was whether the misrepresentations were a substantial factor in Herzfeld's decision to go through with his purchase of the FGL securities and determined that the Laventhol material was such a factor.
 
 
 41
 Laventhol contends that the Court erred and would have us attribute Herzfeld's purchase of the securities to his own enthusiasm, his acquaintance's touting, the FGL letter which accompanied the Laventhol report in short, to everything but the Laventhol material. As to the Laventhol material, Laventhol argues that Herzfeld ignored it and emphasizes that Herzfeld read neither the opinion letter nor footnote 4 to which both the opinion letter and the income statement referred. This, to Laventhol, is fatal because it contends, inter alia, that the only statement made by an auditor upon which an investor is entitled to rely is the auditor's opinion letter. We agree with none of these arguments.
 
 
 42
 The Trial Court invoked the appropriate reliance test. Generally speaking, a plaintiff in a Rule 10b-5 damage action must prove that the misrepresentation was a "substantial factor" in his securities activities. Titan Group Inc. v. Faggen, 513 F.2d 234, 238-39 (2d Cir.), cert. denied,423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975). Globus v. Law Research Serv. Inc., 418 F.2d 1276, 1291-92 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970).
 
 
 43
 The Trial Court correctly applied the "substantial factor" test. Even assuming that persons other than Laventhol first aroused Herzfeld's interest in FGL, or that the FGL cover letter which accompanied the Laventhol material may have influenced Herzfeld somewhat, these considerations do not defeat Herzfeld's claim. Herzfeld was not required to prove that the Laventhol material was the sole and exclusive cause of his action, he must only show that it was "substantial", i. e., a significant contributing cause.
 
 
 44
 The Laventhol material was clearly a substantial factor. Looking at the transaction as a whole, it becomes clear that the investment decision was predicated upon confirmation of the Agreement's financial presentation by the Laventhol audit. The FGL letter explicitly informed the tentative investors of this fact and the Agreement itself conditioned its financial data on the auditor's confirmation. Herzfeld examined the Agreement and its income statement which suggested that FGL was a "very profitable company". When the Laventhol material was distributed he checked its income statement which provided the crucial corroboration of the Agreement's picture of corporate health. As the Trial Court observed "He paid particular attention to the earnings indicated and was very impressed by the deferred gross profit of $1,795,000. (sic) The latter figure, he understood, meant 'that this is a profit that the company had made and was going to pick up in a subsequent accounting period.' " In reliance upon this corroborative Laventhol financial statement, Herzfeld completed his investment in FGL securities.
 
 
 45
 In view of our imposition of liability on the ground that the Laventhol audit was materially and knowingly misleading and that Herzfeld relied thereon, we need not pass upon the questions whether there was a violation of New York State statutory or common law.
 
 
 46
 The issue here is not one of negligence, but of the "materially misleading" treatment of facts known to Laventhol in its submitted audit.
 
 
 47
 The function of an accountant is not merely to verify the correctness of the addition and subtraction of the company's bookkeepers. Nor does it take a fiscal wizard to appreciate the elemental and universal accounting principle that revenue should not be recognized until the "earning process is complete or virtually complete", and "an exchange has taken place."[6] Insofar as FGL's interest in the Monterey transactions is concerned, the earning process had hardly commenced, let alone neared completion. As of November 30, 1969, FGL had paid only $5,000 cash out of $13.2 million dollar purchase price and accepted a $25,000 "deposit" under a $15.3 million contract. Conditions for closing were unsatisfied. There remained the consummation of its purchase from Monterey, the furnishing to Continental of current title reports, and the delivery of the CC&R's and a copy of a lease. By the close of November 30, 1969, title had not passed. Nor was this the exceptional instance of a conditional sale or a long-term lease with purchase option, where the retention of title does not vitiate the economic reality of a consummated exchange.
 
 
 48
 Reference to the SEC's Accounting Series Release No. 95, 28 F.R. 276, 5 CCH Fed. Securities Rep. P 72,117, p. 62,272 ("ASR # 95") points toward the same conclusion. That release lists several factors whose presence, according to the SEC, singly or in combination, raises a question of the propriety of current recognition of profit in real estate transactions. Not less than three of these factors inhere in the Monterey transaction including (1) evidence of financial weakness of the purchaser (Continental's insignificant net worth relative to the resale property price); (2) substantial uncertainty as to amount of proceeds to be realized because of form of consideration e. g., non-recourse notes; (3) small or no down payment. Because the FGL offer was a private placement, ASR # 95 was not directly applicable to Laventhol's audit. But since ASR # 95 merely codifies basic principles of accrual accounting theory, we do not reject its corroboration of our own independent conclusions.
 
 
 49
 If the hoped-for profit of $2,030,500 were ever to be realized, it could only come after the transactions had been consummated and consummation was never even contemplated before the audit date, November 30, 1969. FGL's profit till for this transaction as of that date was as bare of profits as Mother Hubbard's cupboard, bare of bones.
 
 
 50
 An accountant should not represent on an audited statement that income and profit exist unless underlying facts justify that conclusion. Here, the underlying facts known to Laventhol dictated precisely the contrary course, namely, that income should not have been recognized for the accounting period ending November 30, 1969. And were it not for Laventhol's disregard of Statements on Accounting Procedure No. 33, Ch. 2, p. 16 (1963) ("SAP 33") it would have confronted additional evidence pointing in the same direction. SAP 33 states:
 
 
 51
 "Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries and confirmations to affirm a reasonable basis for an opinion regarding the financial statements under examination".
 
 
 52
 Laventhol knew that the issuance of FGL securities depended upon a correct ascertainment of that condition. It is undisputed that, without the Monterey-Continental transactions, for the eleven months preceding November 30, FGL had sustained a loss of $772,108. Query: by what accounting legerdemain was this figure converted into a substantial profit? The Monterey purchase added nothing to the FGL till. To the contrary, it reduced it by $5,000 (if the check was honored). The Continental sale produced a down payment of $25,000 (if made) but no profit. In fact, if the hoped-for profit of $2,030,500 were ever to be realized, it could only come after the transactions had been consummated and consummation was never even contemplated before the audit date, November 30, 1969.
 
 
 53
 Laventhol points to the Trial Court's finding that the Monterey-Continental transactions were not "phony". This finding, however, only implies that there were signed agreements between the parties. By no stretch of the imagination does it imply that profits of $2,030,500 were realized therefrom before November 30, 1969, or would be at any time until consummation. In fact, both agreements showed on their face that the principal payments were to be made in 1970.
 
 
 54
 In such circumstances, the recognition of Monterey transactions was a materially misleading statement which, once included at the top of the income statement as a sale, resulted in, or necessitated, compensating adjustments which distorted all the financial figures which followed. A reasonable man in Herzfeld's position might well have acted otherwise than to purchase the FGL securities, had the truth been told and the Monterey transactions not been misleadingly represented as a consummated purchase and sale. See Chasins v. Smith, Barney & Co., 2 Cir., 438 F.2d 1167 (1970); SEC v. Texas Gulf Sulphur, 401 F.2d 833, 849 (2d Cir.) (en banc) cert. denied sub nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1968).
 
 
 55
 This misleading impression was aggravated by Laventhol's labelling of the $1,795,500 as "deferred" as opposed to "unrealized" gross profit. Such nomenclature conveyed the erroneous impression that all that profit was so much cash in hand and would be recognized periodically in futuro just as if it were prepaid interest or management fees. But as Laventhol well knew, net cash had increased only $20,000, and the transaction was still in doubt.
 
 
 56
 Having engendered its own quandary, it ill behooves Laventhol to seek the solace of SAP 33, which concerns the rendition of a qualified auditing opinion. But even assuming the propriety of allowing Laventhol as extricate itself by the simple expedient of disclaiming or qualifying its opinion of the very financial statements which it concocted, Laventhol did not follow the route proscribed by SAP 33. At Chapter 10, page 58, SAP 33 provides, inter alia :
 
 
 57
 "When a qualification is so material as to negative an expression of opinion as to the fairness of the financial statement as a whole, either a disclaimer of opinion or an adverse opinion is required."
 
 
 58
 "When a qualified opinion is intended by the independent auditor, the opinion paragraph of the standard short-form report should be modified in a way that makes clear the nature of the qualification. It should refer specifically to the subject of the qualification and should give a clear explanation of the reasons for the qualification and of the effect on financial position and results of operations, if reasonably determinable." (emphasis added)
 
 
 59
 But Laventhol did not provide a clear explanation of the reasons for the qualification. A simple note would have sufficed saying in substance:
 
 
 60
 "Agreements for the purchase of Monterey Nursing Inns, Inc. for $13,362,500 and the sale thereof to Continental Recreation, Inc. for $15,393,000, have been executed. When, as and if these transactions are consummated, FGL expects to realize a profit of $2,030,500."
 
 
 61
 Instead, Laventhol chose to delete from its first so-called explanatory Note 4, the sentence "Because of the circumstances and nature of the transaction, $1,795,500 of the gross profit therein will be considered realized when the January 30, 1970 payment is received" and substituted therefor the sentence "Of the total gross profit of $2,030,500, $235,000 is included in the Consolidated Income Statement and the balance, $1,795,500 will be considered realized when the January 30, 1969 payment is received." The substituted note also changed "unrealized gross profit" to "deferred income". Even in the first Note, there is no explanation of what were the circumstances and nature of the transaction or, in the second Note, how or why $235,000 could qualify as gross profit or income as of November 30, 1969.
 
 
 62
 From the very outset of the audit, the danger signals were flashing.
 
 
 63
 (1) Even if Laventhol accepted the agreements as not "phony", on the face of the Monterey agreement were two conditions to be performed, i. e., approval by FGL of a title search and a lease back. There was no proof that they were performed or that Laventhol made any effort to verify these facts.
 
 
 64
 (2) Normally on transactions of such magnitude and vital importance, corporate minutes, resolutions and other corporate papers authenticating the transaction would be examined. No proof of such examination was presented.
 
 
 65
 (3) Laventhol demonstrated an awareness that the legality of the agreement with Continental might be important. However, a telephone call to an attorney who did not even see or read the agreement and who only heard such excerpts as Laventhol's partner chose to read to him, scarcely qualifies as a legal opinion as to enforcibility.
 
 
 66
 (4) As for Continental, Laventhol knew that it had contractually committed itself to pay $15,300,000 to FGL and that Continental had assets of only some $100,000, consisting mostly of miniature golf courses. Laventhol was aware that Max Ruderian was a well-known, successful, and wealthy real estate operator and had signed the Continental agreement but there is no document which evidences that Ruderian's wealth was in any way committed to the Continental purchase.
 
 
 67
 (5) The absence of entries of the transactions on FGL's books and the necessity for Laventhol to create journal entries thereof.
 
 
 68
 (6) Laventhol, whose duty it was to reveal the truth rather than be subservient to the dictates of its clients, FGL, should have taken warning from FGL's pressurizing tactics to change "unrealized profits" to "deferred".
 
 
 69
 In sum, we affirm the result reached by the Trial Court in holding that the Laventhol report contained materially misleading omissions and misrepresentations. The term "result" is used advisedly. Although we agree with the facts as found by the Trial Court, we do not accept its opinion that all of the ten items specified therein were required to be included in Laventhol's report. The vice of the report was its representation that the Monterey transactions were consummated and the concomitant statement that current and deferred profit had been realized. This would have been remedied by simply not recognizing the sales as completed transactions for the accounting period ending November 30, 1969. A specific listing of the facts which dictated that treatment would have been unnecessary.
 
 
 70
 There remains for consideration the effect, if any, of the Supreme Court's recent decision in Ernst & Ernst v. Hochfelder, --- U.S. ----, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In that case, a firm of accountants petitioned the Court to review a decision of the Seventh Circuit. The Court of Appeals had reversed a decision of a trial court granting summary judgment in favor of the accountants and against securities purchasers in an action based upon an alleged negligent audit by Ernst & Ernst. The gist of the charge was that the accountants "failed to utilize 'appropriate auditing procedures' in its audits of First Securities, thereby failing to discover internal practices of the firm said to prevent an effective audit." Hochfelder, supra, 96 S.Ct. at 1379.
 
 
 71
 The Supreme Court clearly defined the scope of its decision as "whether a private cause of action for damages will lie under § 10(b) and Rule 10b-5 in the absence of any allegation of 'scienter' intent to deceive, manipulate, or defraud. (footnote omitted)" Id. at 1381. There is no question here that Herzfeld's amended complaint against Laventhol adequately alleged scienter in that Laventhol
 
 
 72
 "(a) employed a device, scheme or artifice to defraud plaintiff; (b) made untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices and a course of business which operated as a fraud and deceit on plaintiff." App. p. 112a
 
 
 73
 The difference, therefore, between the factual situation before the Supreme Court in Hochfelder, where "(T)hroughout the lengthy history of this case respondents have proceeded on a theory of liability premised on negligence, specifically disclaiming that Ernst & Ernst had engaged in fraud or intentional misconduct. (footnote omitted)" Id. at 1391 and the case before us involving affirmative acts by Laventhol which were materially misleading, is clear. The accountants here are not being cast in damages for negligent nonfeasance or misfeasance, but because of their active participation in the preparation and issuance of false and materially misleading accounting reports upon which Herzfeld relied to his damage.
 
 
 74
 Nor does Herzfeld's failure to read the opinion letter or "explanatory" footnote vitiate his reliance upon the figures in the financial statement which he did examine. The opinion letter and "explanatory" footnote were as misleading as the figures in the financial statement. None of these discrete portions of the Laventhol audit adequately disclosed the serious question marks surrounding the Monterey transaction.
 
 
 75
 In his initial complaint, Herzfeld sought compensatory damages and punitive damages for $1 million from Laventhol, Allen and 10 other defendants. In 1971 Herzfeld settled with and released all defendants except Laventhol in exchange for $357,000. The District Court, per Palmieri, J., over Laventhol's objection, approved the settlement and dismissed the complaint as to the settling defendants with the proviso that "Laventhol, if it is so advised, can bring third-party actions against any of the settling defendants."
 
 
 76
 In its third-party complaint against Allen, FGL, Charles Allen, Lee W. Meyers, Irwin H. Kramer, Richard M. Firestone, Martin A. Scott and David Baird, Laventhol sought, by way of indemnification and contribution to recover from these third-party defendants for the amount of any judgment, costs, expenses and attorneys' fees for which Laventhol might be liable in the Herzfeld suit against it. In their answer, in addition to denials, certain third-party defendants, Allen, Charles Allen and Irwin H. Kramer, asserted counter-claims against Laventhol for damages in the amount of $1,890,000. The basis for these claims is that they were the assignees of all rights of purchasers of the units. No proof was adduced from these purchasers as to the circumstances under which they purchased the FGL units or the extent of their knowledge, if any, of the facts.
 
 
 77
 The Trial Court dismissed the third-party complaint against Kramer for lack of proof. However, as to Allen, the Court found that "Allen plainly failed to fulfill its duty of full and fair disclosure to investors." It premised this conclusion on the fact that Meyer was a director of FGL and a vice-president of Allen. However, it denied Laventhol a right to indemnity from Allen on the theory that "(O)ne who intentionally joins in the perpetration of a fraud is denied a right of indemnity for others participating in the wrong, whether the claim is predicated on violation of the securities laws or the common law (footnote omitted)". 378 F.Supp. at 135.
 
 
 78
 The Court believed that "Laventhol's claim for contribution rests on firmer ground," namely, Allen's knowledge through its officer, Meyer, that there were major discrepancies between the audited and unaudited reports and that Meyer attended a conference at which the contents of the proposed December 16th letter were discussed. After trial the Trial Court computed damages on the main claim, subtracted the settlement from the total and, finding Allen in pari delicto with Laventhol, ordered Allen to pay one-half of the remainder, i. e., $76,500.
 
 
 79
 The Allen-Herzfeld settlement for $357,000 and its significance must be given closer attention. We do not find the ground as firm as the Trial Court. The cases cited by the Court and in the Laventhol brief each deal with facts quite different from those here presented. The Court used as its foundation stone the principle that a wrongdoer should be permitted "to escape loss by shifting his entire responsibility for damages to another party" and that "(T)o deny contribution would be to dilute the deterrent effect of the securities laws, since Allen, a participant in Laventhol's fraud, would escape responsibility for its wrongdoing." 378 F.Supp. at 135.
 
 
 80
 Neither principle is applicable to the facts before us. A review of the facts as found by the Trial Court vis-a-vis the Allen-Laventhol relationship, shows that the Laventhol report which was the source of the false and misleading audit was dated as of, and was issued on, December 6, 1969. There is no suggestion that Allen had anything to do with its preparation. Allen's liability to Herzfeld resulted from its sale of securities with knowledge of the false and misleading nature of the figures in Laventhol's December 6th report. This knowledge came to Allen through its vice-president, Meyer. Only after the report in final form was received, did Meyer participate in discussions which had, for their purposes, the making of changes favorable to FGL therein. But this proof only strengthened Herzfeld's case against Allen because it made Allen also liable for selling the securities on the basis of the Laventhol report. However, this liability had been extinguished as to Allen and its co-defendants (except Laventhol) by the $357,000 settlement.
 
 
 81
 Quite apart from any degree of difference in culpability, had the original Herzfeld suit been tried against the Allen group and Laventhol, and, even on the theory of joint Laventhol-Allen liability, they had been held to be joint tort-feasors and compelled to restore to Herzfeld his $510,000 loss (excluding any claim for punitive damages), the respective amounts payable as joint tort-feasors (and on the Court's pari delicto theory) whether by judgment, contribution or principles of equity, should have been $255,000 each. Allen, however, to make peace with Herzfeld, had paid him $357,000 (on behalf of itself and others than Laventhol) and thus had removed itself from the category of a tort-feasor defendant. In Herzfeld's subsequent suit to recoup from Laventhol the balance of his $510,000 (namely, $153,000), Allen was not made a defendant and could not properly have been by dint of the settlement. Thus, Allen is not a joint feasor, vis-a-vis Herzfeld, in the present suit.
 
 
 82
 Allen had already paid Herzfeld far more than half of Herzfeld's loss. It neither escaped responsibility nor the deterrent effect of its settlement, but by the settlement its tort-feasor status had been removed. The procedural principle to which the Trial Court referred, i. e., to simplify the litigation "by bringing in the third party into the prime action . . ." is the very eventuality Allen sought to (and in our opinion did) avoid by its settlement. New York General Obligations Law § 15-108 (23A McKinney's Supp.1975) supports this doctrine.
 
 
 83
 As to Allen's attempt to sue as an assignee, putting to one side the question whether any assignments were ever consummated, Allen was not entitled to recover on the claims because it failed to prove a necessary element common to all the assignor's claims. Allen, as assignee, stood only in the shoes of its assignors. However, of all the purported assignors only one was questioned about his reliance upon the Laventhol audit and it appears that he relied predominantly on the fact that Allen's name was behind the placement. No evidence was adduced sufficient to establish a claim by these purchasers against Laventhol. Accordingly, we affirm the dismissal of Allen's counterclaims with prejudice.
 
 
 84
 Despite this manifest insufficiency of proof as a matter of law, Allen contends that it is entitled to a new trial on the issues. We disagree. Allen had its day in court; it is entitled to no more. Nor is there any reason to remand the counterclaims to the district court for it to enter specific findings corroborating the insufficiency. While F.R.C.P. rule 41(b) requires findings of fact pursuant to F.R.C.P. rule 52(a) where a claim tried before a court is dismissed for insufficiency, in this case a remand to cure the defect would be pointless. The record is barren as to reliance and consequently points to but one conclusion.
 
 
 85
 The judgment in favor of Herzfeld against Laventhol in the amount of $153,000 with costs and with interest at the rate of 71/2% from January 1, 1971 to September 1, 1972 and at the rate of 6% from September 1, 1972 to the date of payment, is affirmed; the judgment in favor of third-party plaintiff Laventhol against third-party defendant Allen in the amount of $76,500 with costs and one-half the interest payable by Laventhol under the judgment rendered against it is reversed; and the dismissal of the counter-claim of Allen against Laventhol is affirmed without costs.
 
 
 
 *
 Honorable Alfred W. Coffrin, United States District Judge for the District of Vermont, sitting by designation
 
 
 [1]
 The eleven other defendants listed on the summons and complaint are The Firestone Group, Ltd., Allen & Company, Incorporated, Allen & Company, Charles Allen, Lee W. Meyers, Irwin H. Kramer, Richard M. Firestone, Martin A. Scott, Holtzmann, Wise & Shepard, James W. Deer, and Jacobs, Persinger & Parker
 
 
 [2]
 The action was alleged to arise under the Securities Act of 1933, § 17(a), 15 U.S.C. § 77q(a), and the Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b), and Rules and Regulations of the Securities and Exchange Commission, promulgated thereunder, 17 C.F.R. 240.10b-5
 
 
 [3]
 Each agreement was prepared by the same employee of FGL
 
 
 [4]
 Covenants, Conditions and Restrictions
 
 
 [5]
 " § 240.10b-5 Employment of manipulative and deceptive devices
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."
 
 
 [6]
 American Institute of Certified Public Accountants, Accounting Principles Board, Statement No. 4 § 150; 2 CCH Accounting Principles p. 9086