Nathaniel C. BERKOWITZ et al., Plaintiffs,

v.

Joel BARON et al., Defendants.

No. 70 Civ. 5139 (JMC).

United States District Court,
S. D. New York.

Feb. 9, 1977.
As Amended Feb. 14, 1977.

Louis Newman, New York City, of counsel; Moore & Wohl, P. C., New York City, for plaintiffs.

William Klein, II, Jeffrey S. Ramer, New York City, of counsel; Austrian, Lance & Stewart, P. C., New York City, for defendants Joel Baron and Gail Baron.

Robert E. Meshel, New York City, of counsel; D'Amato, Costello & Shea, New York City, for defendant Benjamin S. Markowe & Co.

## DECISION

CANNELLA, District Judge.

After a bench trial of this securities fraud action brought pursuant to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5, and the common law of the State of New York, plaintiff Howard

Hoffman is granted judgment against defendants Gail and Joel Baron and Benjamin S. Markowe & Company ("Markowe") in the amount of $550. The claims asserted by plaintiffs Nathaniel Berkowitz and Edward Yaste are dismissed with prejudice, as are the counterclaims interposed by the Barons.

### FACTS

The instant dispute arises out of the sale by Gail and Joel Baron, defendants herein, of all the issued and outstanding stock of two companies—Scotties by Cromwell, Inc. and Cromwell Manufacturing Co. [hereinafter collectively referred to as "the companies"][1] to plaintiffs Nathaniel Berkowitz, Howard Hoffman and Edward Yaste. The companies, conceived by Gail Baron's father in 1943, became respected manufacturers of fine children's clothing. Ms. Baron's father was the companies' chief operating officer when he died in 1962. The next four years saw the deaths of Ms. Baron's mother, the plant manager and the sales manager. Thus, in 1966 Gail Baron inherited her parents' one-half interest in the companies, and, after purchasing the remaining one-half interest for approximately $450,000, she and her husband Joel faced the task of running the business.

Joel Baron, assuming the position of chief operating officer, apparently had much less business acumen than his father-in-law, for the companies began experiencing serious difficulties as early as 1968. Compounding these early problems was the unionization of the companies' plant and the loss of the friendly relationship it had enjoyed with its largest supplier when that company changed ownership.

In 1969 the Barons attempted to sell the companies for $500,000, but no purchaser surfaced. Howard Hoffman showed some interest in the companies, but considered the price exorbitant. The companies' financial position continued to deteriorate, its first net loss appearing in the April 1969 financial statement. This loss was accompanied by a rise in inventory and a concomitant decrease in working capital. Moreover, the market for children's clothing was changing and the Barons could not compete effectively with the new styles.

Beleaguered by physical maladies as well as by continuing business problems, Joel Baron made a forlorn attempt to get out of the children's dress business in mid-1970, spreading the word that he would be willing to sell the companies for next to nothing. This time Hoffman was highly interested, and on August 19 he visited the plant in Springfield, Massachusetts together with Nathaniel Berkowitz and Edward Yaste. After ascertaining in this manner that the companies were in fact a going business, Hoffman, Berkowitz and Yaste signed a letter of intent for their purchase.[2] Six days later, on August 26, 1970, the principals met to negotiate the terms of the contract of sale, which they signed later that day.

Pursuant to this contract the Barons delivered a portion of their stock holdings to the companies, and transferred the remaining stock to Yaste, Berkowitz and Hoffman. In return the purchasers agreed to pay Joel and Gail Baron $10,000 within one year of the closing date plus an additional $40,000 over the following four years. While the initial $10,000 payment was unconditional, the remaining $40,000 sum was contingent upon the companies' showing a net income during the ensuing five years.

The contract further acknowledged that the Barons had pledged $195,000 of their personal funds as partial security for the companies' indebtedness to Hubschman Factors Corp. ("Hubschman") and provided that the Barons would be entitled to rescind the sales agreement if the security was not released by December 31, 1970. Moreover, the Barons warranted that the financial statement for the year ending April 30, 1970 "fully and accurately present[s] as of its date the financial condition and assets and liabilities of the Companies and fully and accurately present[s] the results of operations of the Companies for the period

---

1. The two corporations operated as a single unit.

2. The letter of intent was also subscribed to by Joel and Gail Baron.

indicated." In that the sale was effectuated nearly four months after the end of the period reflected in the financial statement, the Barons also certified that there had been no material adverse change in the net worth of the companies during the interim. A change of less than $30,000 was deemed immaterial.

In sum, the record reveals that within a week of their initial conversation, the parties consummated the companies' purchase and sale. The sellers knew next to nothing about Messrs. Yaste, Berkowitz and Hoffman and, for their part, the purchasers knew next to nothing about the companies they were obtaining and even less about the children's dress business. To the Barons the sale undoubtedly represented a desperate attempt to salvage the Hubschman collateral; the purchasers viewed the deal as an opportunity to take over an ongoing business while exposing themselves to little or no personal risk. Despite such hopes, it appears that the purchasers, having far less expertise, initiative and determination than the sellers had imagined, soon found themselves with a business that was terminally ill.

At the time the contract was executed Hoffman, Yaste and Berkowitz all indicated that they were prepared to invest up to $200,000 to meet the working capital needs of the companies,[3] needs of which they were apprised beforehand; yet no such investments were forthcoming. Quite to the contrary, between August 26 and October 23, when the companies were abandoned by the plaintiffs herein, no new financing or factoring arrangements were made (nor was any attempt made to substitute other security for the collateral pledged by the Barons to support the Hubschman factoring agreement), and no fresh money was put into the business. The only change effected by the new owners was an acceleration of inventory liquidation, including shipment of $5,000 worth of goods to a boutique owned by Yaste's wife, for which payment was never received. Furthermore, the new owners proved incapable of obtaining new orders, aside from a substantial purchase order by Saks Fifth Avenue, and filling old ones. Even the Saks order was never filled. Unable to obtain continued financing from Hubschman, and unwilling to make the necessary advances of capital themselves, the plaintiffs closed the plant on October 23, 1970. The companies have since entered into and completed bankruptcy proceedings.

No part of the purchase price has ever been paid.

## DISCUSSION

Plaintiffs attribute their lack of success with the companies and their consequent lack of desire to make any investment therein to certain material misstatements in the April 30, 1970 financial statement which were allegedly part of a fraudulent scheme perpetrated to induce them to purchase the companies' securities. The complaint alleges six separate causes of action against Joel and Gail Baron based upon this alleged fraud, and one cause of action against Benjamin S. Markowe & Company, the accounting firm responsible for preparation of the financials. In that the Court finds support in the record for the claimed violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5, by defendants Joel and Gail Baron, and for the common law fraud claim alleged against Markowe, the other issues raised by the pleadings need not be reached.

### The Securities Exchange Act Claim

Rule 10b–5 provides in pertinent part that

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
>
> .  .  .  .  .  .
>
> the contract and thus become legally obligated to provide an influx of capital.

---

**3.** Although the purchasers verbally expressed this intention, they refused to make it part of

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.[4]

The Court finds that the companies' financial statement for the fiscal year ending April 30, 1970, given to the plaintiffs prior to the execution of the contract, did not fully and fairly portray the financial condition of the companies and thus violated the Rule.

The most troublesome aspect of the financial statement is the treatment accorded certain items reported therein.[5] One such item is shipping cost and expenses totalling $145,281.76.[6] This sum was included as a component of manufacturing overhead. Expert testimony established that this method of presentation was not in accord with generally accepted accounting principles of the time. The appropriate procedure would have been to treat such shipping costs as an operating expense, as was done in the 1969 financial statement, and take it as a deduction against gross profit, instead of including it in cost of goods sold, above the gross profit line.

The effect of this treatment was to cast a false picture of the companies' net income and inventory value. Because manufacturing overhead is a component of cost of goods sold, which in turn is one element of inventory value, improper incorporation of shipping costs and expenses in manufacturing overhead resulted in an overstatement of inventory computed to be approximately $44,560 by plaintiffs' expert witness.[7] The enlarged inventory entry had a direct effect on the net loss/net income figure reported in the financial statement. Had the shipping costs and expenses been treated according to generally accepted accounting principles, the companies would have shown a net loss of approximately $24,960 (less the tax effect) for the fiscal year ending April 30, 1970, instead of a net income of $19,603, as was reported.[8]

Another item, factoring charges, was likewise treated in a manner not in accordance with generally accepted accounting principles.[9] These charges, in the amount of $28,686.41, were shown as a deduction in arriving at net sales and appear above the gross profit line on the balance sheet. Proper accounting procedures required that factoring charges be deducted below the gross profit line (as was done, incidentally,

---

4. Rule 10b–5 was promulgated pursuant to the grant of authority given the Securities and Exchange Commission by Congress in Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b).

   Manipulative and deceptive devices.

   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

   .    .    .    .    .

   (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

5. Plaintiffs also claim that the dollar inventory figure of $669,614.58 in the April 30 balance sheet was intentionally overstated by defendants. However, the Court finds the testimony regarding the "complete" physical inventory

taken by Berkowitz, Hoffman and Yaste in early September incredible and wholly unworthy of belief. There is therefore no proof that the inventory figure was overstated, save in terms of the accounting treatment discussed in the text, *infra*.

6. Shipping costs and expenses are composed of shipping salaries, the costs of supplies and charges incurred for express and parcel post.

7. Raphael Cohen, the accountant who prepared the financials, testified that, even if the treatment of these items was improper, the net effect would only have been $19,000. He offered no explanation of his computations, however.

8. As noted earlier, these costs were treated properly in the 1969 financial report. No notation indicating this change from previous practice or the deviation from generally accepted accounting principles appears on the 1970 statements.

9. Again, the financial statement contains no notation of this.

in 1969). This handling of factoring charges, as well as the improper treatment of shipping costs and expenses, resulted in a lowered gross profit figure.[10]

Without going into detail, it can be seen that these charges created a financial picture for the companies that was inaccurate. The slightly inflated inventory figure gave rise to an overoptimistic estimate by plaintiffs of the revenues anticipated from liquidation of the inventory. Reporting the items above the gross profit line altered the gross profit percentage. The appearance of a small net income instead of a small net loss falsely supported the view that with good management a profit could be made.

■ Given these conditions, a finding that the financial statement is "materially misleading" is fully supported. Stated generally, the traditional test of materiality in 10b–5 suits is whether the fact is such that a reasonable investor *would* have considered it important in making the decision or *might have* acted otherwise had it not been misleadingly represented. *E. g., Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* 540 F.2d 27, 35 (2d Cir. 1976); *Chasins v. Smith, Barney & Co.,* 438 F.2d 1167, 1171 (2d Cir. 1970); *SEC v. Texas Gulf Sulphur,* 401 F.2d 833, 849 (2d Cir.) (en banc), *cert. denied sub nom. Coates v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1968). Whether this standard survives the definition of materiality recently enunciated by the Supreme Court with respect to misleading proxy statements—a fact is material "if there is a *substantial likelihood* that a reasonable shareholder would consider it important" in reaching a decision, *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2133, 48 L.Ed. 757 (1976) (emphasis added); *see Galfand v. Chestnut Corp.,* 545 F.2d 807, 813 (2d Cir. 1976)—or has been replaced by it, the net income/net loss and inventory value entries on a corporate financial statement are of material importance to parties interested in purchasing all of the outstanding shares of the company. This is especially true where, as here, little other information about the business is transmitted to the purchasers prior to the consummation of the sale.

■ Similarly, the Court finds that plaintiffs have established reliance on the misrepresentations; they have proved that the misrepresentations were in fact substantial factors in the securities transactions involved. *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* 540 F.2d 27, 33 (2d Cir. 1976); *Globus v. Law Research Serv., Inc.,* 418 F.2d 1276, 1291–92 (2d Cir. 1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970). Plaintiffs' testimony, though it established little else, established that they relied exclusively on the representations contained in the financial statement and the fact that the factory was in operation when the transaction took place. Moreover, the fact that plaintiffs demanded and received assurance that the net worth of the companies had not changed by more than $30,000 between April 30, the effective date of the financial statement, and the August 26 signing of the contract indicates that the financial picture of the companies as reflected in the financial statement was a substantial factor in plaintiffs' decision to purchase. In sum, plaintiffs were induced to purchase a business that was worth less than they had been led to believe.

■ Furthermore, the Court is convinced that the Barons acted with the intent—*scienter*—required for a Rule 10b–5 violation. See *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1304–06 (2d Cir. 1973) (en banc). Given the rapidly deteriorating health of both Joel Baron and the companies, the Barons' consequent strong desire to dispose of the business and the unexplained change in presentation between 1969 and 1970 of the items discussed above, the Court concludes that the financial statements were purposely prepared to give a false impression of the companies' value as a going concern and

---

**10.** The mistreatment of the factoring charges, however, had no effect on net income.

thus foster the Barons' sale of the business. The Court also concludes that this was done with the knowledge of the Barons, if not at their direction. The Barons, having caused the issuance of a materially misleading financial statement on which plaintiffs have relied, thereby violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 of the SEC, 17 C.F.R. § 240.10b–5, promulgated thereunder.

### The Common Law Fraud Claim

Plaintiffs claim that defendant Markowe's participation in the above fraud subjects it to liability under the common law of New York.[11] The Court agrees. In preparing the now discredited financial statement Markowe knowingly participated in the issuance of a false and materially misleading accounting report upon which plaintiffs relied.

In the seminal case on the issue of accountants' liability in connection with the preparation of financial statements, Chief Judge Cardozo for the New York Court of Appeals stated:

> The [accountants] owed to their employer a duty imposed by law to make their certificate without fraud, and a duty growing out of contract to make it with the care and caution proper to their calling. . . . . To creditors and investors to whom the employer exhibited the certificate, the defendants owed a like duty to make it without fraud, since there was notice in the circumstances of its making that the employer did not intend to keep it to himself.

*Ultramares Corp. v. Touche,* 255 N.Y. 170, 179, 174 N.E. 441, 444 (1931).

■ The threshold requirement of *Ultramares* is that, in order for Markowe to be liable to these plaintiffs, they must be within the class of persons that Markowe should reasonably have expected to rely on the statements. *See American Elec. Power Co. v. Westinghouse Elec. Corp.,* 418 F.Supp.

435, 450 (S.D.N.Y.1976) (Carter, J.). The Court finds this requirement satisfied. Markowe's claim, that it was unaware of the Barons' desire to sell the companies prior to the issuance of the 1970 financial statement, is not dispositive of the issue, for certainly an accountant cannot escape liability for a misleading financial statement merely by asserting he did not know the *specific* purpose to which the financials were to be put. The evidence showed that Markowe was aware of circumstances indicating that the statements would be used to attract investor interest.

■ As applied to this case, the remaining elements of fraud under the common law of New York are similar to those under the federal securities laws. Thus, plaintiffs must prove that Markowe knowingly made false representations of material fact with the intent to deceive investors and induce them to rely thereon, and that plaintiffs did rely on the representations to their detriment. *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* 378 F.Supp. 112, 131 (S.D.N.Y.1974) (MacMahon, J.), *aff'd in part rev'd in part,* 540 F.2d 39 (2d Cir. 1976); *Jo Ann Homes at Bellmore, Inc. v. Dworetz,* 25 N.Y.2d 112, 119, 250 N.E.2d 214, 302 N.Y.S. 2d 799, 803 (1969); *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.,* 4 N.Y.2d 403, 406–07, 151 N.E.2d 833, 176 N.Y.S.2d 259, 262 (1958). *See State Street Trust Co. v. Ernst,* 278 N.Y. 104, 15 N.E.2d 416 (1938) (semble); *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931) (semble).

■ Having already determined that the financial statements contained material misrepresentations which were relied upon by the plaintiffs, the Court turns to a discussion of the remaining element, intent. Insofar as *scienter* is concerned, the changes in presentation between 1969 and 1970 and the fact that the 1970 treatment was not consistent with generally accepted accounting principles belie any defense based on negligence or lack of intent on Markowe's behalf.

---

**11.** Jurisdiction over this claim is predicated upon diversity of citizenship.

■ This conclusion is buttressed by evidence of still another deviation from sound accounting principles. Joel Baron testified that he directed Cohen to accord particular accounting treatment to certain loans extended to the Barons by the companies, an apparent attempt to conceal the loans from Hubschman (the loans violated the factoring agreement). That this request was acceded to shows that Cohen was willing to deviate from generally accepted accounting principles to satisfy the Barons. Moreover, an alternative explanation of the questioned accounting techniques, *i. e.*, why the changes between 1969 and 1970 were made, is conspicuously absent. Finally, having conducted a number of the companies' audits, Markowe had knowledge of the facts which render its report misleading.

*Damages*

■ Plaintiffs claim they are entitled to recover the difference, in excess of $30,-000, between the companies' actual net worth at the time of the transfer and their net worth as reflected by the financial statement,[12] as well as out-of-pocket losses. However, in instances where a party has been fraudulently induced to enter into a contract, both New York and federal law clearly limit recovery to the actual pecuniary loss suffered. Thus, plaintiffs herein are not entitled to the "benefit of their bargain." They are entitled to recover only that which they were induced to part with. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 154–55, 92 S.Ct. 1456 (1972); *Harris v. American Investment Co.,* 523 F.2d 220, 224–25 (8th Cir. 1975) (en banc), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976); *Zeller v. Bogue Elec. Mfg. Co.,* 476 F.2d 795, 801–02 (2d Cir.), *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973); *Levine v. Seilon, Inc.,* 439 F.2d 328, 334 (2d Cir. 1971) (cases decided under federal law); *Herzfeld v. Laven-*

*thol, Krekstein, Horwath & Horwath, supra,* 378 F.Supp. at 137; *Sager v. Friedman,* 270 N.Y. 472, 480–81, 1 N.E.2d 971 (1936); *Reno v. Bull,* 226 N.Y. 546, 552–53, 124 N.E. 144 (1919); *Mastro Indus., Inc. v. CBS Records,* 50 A.D.2d 783, 377 N.Y.S.2d 79, 81 (1st Dept. 1975) (cases decided under state law). In that plaintiffs have not paid any part of the purchase price, they are only entitled to recover expenditures made as a consequence of their purchase of the companies. No evidence of any such expenditures was presented by either Berkowitz or Yaste. Howard Hoffman testified that between August 26, 1970 and September 25, 1970 he expended approximately $800 in connection with the companies, of which only $250 has been repaid.

Accordingly, after enormous expenditure of judicial time and energy, judgment is hereby granted in favor of Howard Hoffman and against all defendants in the amount of $550. Plaintiff Berkowitz's claims against the defendants are hereby dismissed, as are Yaste's claims and the counterclaims interposed by the Barons. Costs are to be borne by the respective parties.[13]

The foregoing constitute the findings of fact and conclusions of law of the Court pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

SO ORDERED.

---

**12.** The contract deemed a change in net worth of less than $30,000 immaterial.

**13.** The post-trial brief submitted on behalf of defendants Joel and Gail Baron includes a re-

quest for a declaratory judgment determining where liability lies for a $24,049.20 tax assessment. This issue is not properly before the Court.