STATE TEACHERS RETIREMENT BOARD et al., Plaintiffs,

v.

FLUOR CORPORATION and Manufacturers Hanover Trust Co., Defendants.

No. 76 Civ. 2135 (RWS).

United States District Court, S. D. New York.

March 28, 1980.

280

**282**

Schwartz, Shapiro, Kelm & Warren, Columbus, Ohio by Russell A. Kelm and Nelson E. Genshaft, Columbus, Ohio, for plaintiffs.

Cahill, Gordon & Reindel, New York City by Raymond L. Falls, Jr., James J. Foster, John A. Shutkin, New York City, for defendant Fluor Corp.

Kelley, Drye & Warren, New York City by Richard J. Concannon, Robert E. Crotty, New York City, for defendant Manufacturers Hanover Trust Co.

## OPINION

SWEET, District Judge.

This is a class action for damages brought by State Teachers Retirement Board ("State Teachers"), a public pension fund, against the Fluor Corporation ("Fluor"), for material nondisclosures about a major contract in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5. Plaintiff also seeks to recover damages from Manufacturers Hanover Trust Company ("Manufacturers") for allegedly purchasing Fluor stock without disclosing that it had material inside information about this contract.

Three years after the commencement of this action and after the completion of extensive discovery, plaintiff has moved to amend its complaint for a second time. Defendants vigorously oppose this motion and have moved for summary judgment pursuant to Fed.R.Civ.P. 56. For the following reasons, plaintiff's motion to amend its complaint is granted to the extent described hereunder, and defendants' motion for summary judgment is granted.

### I. The Facts

The following facts, submitted pursuant to Local Rule 9(g), are undisputed by the parties. Fluor provides world–wide engineering, construction, procurement and management services to its clients. In September, 1974, the South African Coal, Oil and Gas Corporation Limited ("SASOL"), a quasi–governmental entity of the Republic of South Africa, formally invited Fluor and two other large industrial construction companies to submit proposals on a $1 billion construction project in Sasolburg, South Africa (SASOL II). After engaging in discussions with all three companies, SASOL informed Fluor on February 25, 1975, that Fluor would get the SASOL II contract provided Fluor and SASOL could reach agreement on the Heads of Agreement ("the Agreement"), and provided SASOL's Board confirmed the specific wording of the Agreement. Following additional negotiations, the Agreement was signed by SASOL on February 27 and by Fluor on February 28, 1975.

Paragraph 3 of the Agreement provided:

### PUBLICITY EMBARGO

SASOL has placed an embargo on all publicity with regard to the appointment of a SASOL II contractor and the negotiations as well as the status thereof shall be kept confidential by all persons involved therein up to 10 March 1975 unless the Company Secretary advises to the contrary. The other tenderers will be notified by SASOL that negotiations are in progress with one of the tenderers and that a contract will be awarded if the present negotiations are successful.

SASOL wanted the publicity embargo because of the need to inform the French government of the project and to involve them in its financing. March 10 was also the date of Fluor's annual meeting.

On Friday, February 28, news of the SASOL II contract was circulated to several officers of Fluor, and Walter Russler, Fluor's Director of Investor Relations, began preparation of a press release for the March 10 date. On Tuesday, March 4, Russler received a telephone call from Edward Bejan, a Fluor consultant for investor relations in New York. Bejan stated that he had received a call from a securities analyst

reporting a rumor that Fluor had received a large project.

That same morning, Paul Etter, Fluor's Manager of Public Relations, received a call from David Geffner, a specialist in Fluor stock on the Pacific Coast Exchange, regarding rumors that Fluor had gotten or was working on a large contract. Etter then passed a note to J. Robert Fluor, who was Chairman of the Board and Chief Executive Officer, recounting the call and suggesting that a news release be issued "as soon as possible."

Geffner called again on March 5 and 6 to report other rumors concerning Fluor including a rumor that it had obtained a large contract in the Middle East and that there might be a tender offer for its stock. Etter also received a telephone call on March 5 from a securities analyst with Provident National Bank in Philadelphia reporting rumors emanating from Houston that Fluor had received a big contract in South Africa.

On that same afternoon Russler met with Alexander Blanton, an analyst from Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch"). During that conversation, Blanton asked whether Fluor had gotten the coal gassification contract in South Africa. There is a factual dispute as to whether Russler denied that the contract had been awarded to Fluor or whether he avoided answering the question.

A Reuters reporter also spoke with Russler on March 5, and a story that went out on the Reuters financial wire at 2:02 p.m. (EST) on March 5 or 6, quoted a "spokesman" as saying that the stock rise probably reflected the anticipation of the company's first quarter earnings report and might also be attributable to the fact that the company was "being considered for some major orders."

The volume in trading in Fluor increased significantly on March 5, and the price of the common stock, which had been rising slowly throughout the week, moved upward strongly on Thursday, March 6. This stock activity caused Jonathan Veniar, an employee of the New York Stock Exchange ("the Exchange"), to call the legal department of Fluor. His call was returned late that afternoon by Richard B. Humbert, a Vice President of Fluor. Humbert told Veniar that he was uncertain of the reason for Fluor's increased volume, but indicated among other possible explanations that Fluor had been awarded the SASOL II contract that could not be announced until March 10. At that time Veniar told Humbert that the Exchange might exercise its prerogative to halt trading in the stock pending the announcement of the SASOL contract. Humbert agreed that a suspension might be beneficial.

On Friday, March 7, trading in Fluor common stock was suspended for the entire day pending "a news announcement on Monday." At 9:00 A.M. (EST) on Monday, March 10, the press release regarding SASOL II was issued by Fluor. The opening of trading in Fluor shares was delayed until 11:16 A.M. (EST).

Between the signing of the Agreement on February 27–28 and the announcement of the SASOL II contract on March 10, State Teachers sold most of its Fluor common stock. Its decision to sell Fluor stock was made in January 1975 and was based at least in part on the belief that the market price for Fluor stock would not fully reflect the earnings from projects in unstable foreign countries.

Even before the award of the SASOL II contract Manufacturers held more than 275,000 shares of Fluor stock and Lester Winterfeldt, Manufacturers' securities analyst who followed Fluor, had favorably recommended it. On February 24, 1975, Winterfeldt met with Etter in Los Angeles and spoke briefly with J. Robert Fluor and David Tappan, Jr., president of the wholly owned Fluor subsidiary that was awarded the SASOL II project. While in the Los Angeles area, Winterfeldt also met with other companies, as planned, and on February 27 and 28 he attended a seminar in Houston. During that week, certain portfolio managers at Manufacturers purchased Fluor stock for Manufacturers' account.

Winterfeldt returned to his office on Monday, March 3, 1975, and on March 4 he reported to Joel Tirschwell, a Senior Vice President at Manufacturers, about his recent trip, including his contact with Fluor. On March 4 and 5, Winterfeldt also gave reports to two regularly scheduled meetings of Manufacturers' investment officers about his trip, and afterwards, two groups of investment officers decided to buy Fluor stock.

On March 5 or 6, Daniel Marciano, a trader for Mitchell Hutchins, Inc., called Neil Martin, a trader for Manufacturers and solicited Manufacturers as a purchaser for a block of approximately 150,000 shares of Fluor stock that had been put up for sale by State Teachers. Although the phone calls were not instigated or solicited by Manufacturers, it agreed to buy the stock.

## II. State Teachers Motion to Amend its Complaint

Defendants have no objection to the minor factual changes and revisions made in plaintiff's proposed second amended complaint. They vigorously oppose, however, plaintiff's attempt to alter the action in the following basic ways. First, plaintiff makes new claims against Fluor for its alleged failure to comply with its Listing Agreement with the New York Stock Exchange and for the alleged statement by Russler to Alexander Blanton of Merrill Lynch that rumors of the award of the SASOL II contract were untrue. Second, it now alleges that Manufacturers traded in Fluor stock after receiving from Fluor material inside information unrelated to the SASOL II project. Finally, it adds J. Robert Fluor as a party defendant and claims that he violated Rule 10b–5 and that he breached his fiduciary duty.

### A. Additions of Claims Relating to Listing Agreement and Denial of Rumors

Leave to amend should be freely given when justice so requires. Fed.R. Civ.P. 15(a). While laches and unexcused delay may bar a proposed amendment, the mere fact that an amendment is offered late in the case is not enough to bar it if the other party is not prejudiced. 3 Moore's Federal Practice ¶ 15.08[4] at 15–102 (2d ed. 1979). Although this motion to amend was offered more than three years after the commencement of litigation, this court sees no prejudice to defendant Fluor in permitting the addition of the claims relating to the Listing Agreement [Count II] and the statement by Russler to Blanton denying the rumors about the award of the project [Count III]. Both of these claims directly relate to the SASOL II contract. Their addition would not appear to create the need for any new discovery since Russler, Blanton and his associates at Merrill Lynch have already been deposed and the claim under the Listing Agreement does not raise new factual questions other than those already presented. Therefore, the complaint will be amended to add these claims.

### B. Addition of Claims Unrelated to SASOL II

The attempt to add a claim against Manufacturers and Fluor for disclosures unrelated to the SASOL II project is somewhat more complicated. In its original complaint, plaintiff alleged that defendant Manufacturers purchased approximately 150,000 shares of Fluor common stock from plaintiff on March 6, 1975, without disclosing its knowledge of inside information concerning the negotiation and execution of a contract between Fluor and SASOL. State Teachers now seeks to allege that Manufacturers violated § 10(b) by purchasing the shares with knowledge of other material inside information "concerning Fluor, its operations, backlog, financial condition and prospects on jobs in which Fluor was interested as a bidder [Count V]." It also seeks to claim that Fluor violated § 10(b) by disclosing non–public information to a Manufacturers representative on February 24, 1975 "concerning projects on which Fluor was bidding and projections on earnings and the size of its future backlog of business," and that based on such disclosures Manufacturers purchased more than 292,-000 shares of Fluor stock [Count IV].

■ Defendants oppose these requested amendments of the complaint on the ground that they do not plead fraud with the particularity required by Fed.R.Civ.P. 9(b).[1] It is true that "a plaintiff alleging fraud in connection with a securities transaction must specifically allege the acts or omissions upon which his claim rests." *Ross v. A. H. Robins Co., Inc.*, 607 F.2d 545, 557 (2d Cir. 1979). "[I]t is not an unreasonable burden to expect the plaintiffs to be able to identify the misstatements, omissions or fraud that caused them to engage in particular securities transactions." *Rich v. Touche Ross & Co.*, 68 F.R.D. 243, 247 (S.D. N.Y.1975). In this case, State Teachers' second amended complaint completely fails to apprise the defendants of the actual statements that allegedly were disclosed to Manufacturers and not known to the public generally. Although plaintiff claims that defendants have notice of the nature of these statements because they are contained in an affidavit accompanying plaintiff's motion,[2] this court would still require that plaintiff incorporate the substance of the alleged disclosures before any amendment of the complaint would be permitted.

■ In this case, however, regardless of the particularity of the pleadings, the motion to amend the complaint with respect to these claims will not be granted because the amendments are unduly delayed and will result in undue prejudice to the defendants. In September, 1976, four months after the original complaint was filed, Manufacturers disclosed in its answers to plaintiff's interrogatories that Lester Winterfeldt, a Manufacturers securities analyst, met with Fluor representatives on February 24, 1975. In January 1977, plaintiff deposed Winterfeldt about that meeting and other matters. Ten other Manufacturers employees were deposed and in March, 1978, State Teachers amended its complaint to add Merrill Lynch, Pierce, Fenner & Smith as a defendant,[3] without changing its allegations against Manufacturers. It was not until more than a year later, on July 13, 1979, that plaintiff finally moved to amend its complaint to add these new claims against Fluor and Manufacturers.

Plaintiff's explanation for the delay is that it did not realize that the disclosures allegedly made were not public until it finished deposing Fluor officials in June 1979. This argument proves too much. Plaintiff is not a single unsophisticated investor, but rather a major institutional investor with its own securities analysts who were constantly keeping abreast of all available in-

1. Fed.R.Civ.P. 9(b) provides

 *Fraud, Mistake, Condition of the Mind.* In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

2. Plaintiff has submitted an affidavit stating that on February 24, 1975, Winterfeldt was told by Fluor representatives

 a) that earnings per share for 1975 would be closer to $3.00 than to Mr. Winterfeldt's projection of $2.75;

 b) that backlog would be up for the first quarter of 1975;

 c) that J. Robert Fluor was projecting a year end backlog of $5 billion plus;

 d) that J. Robert Fluor's projection of new orders for 1975 was $2.8 billion;

 e) of projections of 1976 earnings per share of $6.00 and a backlog of $7 billion;

 f) that potential projects in Venezuela, Indonesia, South Africa, and Saudi Arabia were likely to go in 1975;

 g) of the prospects for expansion of the trans–Alaska pipeline and the resulting revenue to Fluor of $500-750 million;

 h) that $400 million had been added to the Alaska pipeline project since October 31, 1974;

 i) of specific projections for the Kelsby, Republic, and Bonner & Moore divisions of Fluor performance for 1975;

 j) that gross production of oil by Pertamina, in which Fluor held a 3.5% interest, was being increased from 50,000 barrels a day to 100,000 barrels a day by June of 1975;

 k) of projections of figures for Fluor's 1975 income statement;

 l) of shareholder dissatisfaction with management's dividend policy;

 m) of Fluor's discovery of oil in Greece; and

 n) that individual projects and not the broad overview would be determinative of Fluor's performance and that there was no diminution of available work;

3. Merrill Lynch was subsequently dropped as a defendant by agreement of the parties on August 6, 1979.

formation about Fluor, one of its many investments. Moreover, although it claims that it only recently learned that this information was not public, it does not indicate how it learned this fact and why it took so long to do so. Therefore, there was undue delay that would justify denying the motion to add these claims at this time. *See* 3 Moore's Federal Practice ¶ 15.08 at 15–94.

An additional basis for denying the motion to amend is the delay these new claims would cause in bringing this case to trial. Plaintiff is now raising claims of alleged disclosures that occurred during the critical time period involved here but are factually distinct from the original claim relating to inside information about the award of the SASOL II contract. The injection of these new issues into the case would create the need for additional discovery into exactly what information was publicly known about Fluor in February and March 1975 and the date of the public dissemination of the allegedly undisclosed information.

Moreover, if these amendments were allowed, they would further delay the trial date because of their effect on the conditional class action certification granted on December 2, 1976. At that time, the conditional class was defined as "all those who sold shares of common stock of Fluor Corporation between March 3 through March 13, 1975,[4] inclusive, without knowledge of Fluor's contract [with SASOL]." *State Teachers Retirement Bd. v. Fluor Corp.*, 73 F.R.D. 569 (S.D.N.Y.1976). Although plaintiff would simply have this court extend the class to those who sold during those dates without knowledge of this additional non-public information, in fact the effects of such alleged disclosures to Manufacturers could have injured sellers far beyond March 13, 1975, since this information was not necessarily made public at that time and Manufacturers continued to buy Fluor stock beyond that date. Because State Teachers sold all of its Fluor stock before March 13, amendment of the complaint would necessitate that an additional class representative be located for the period extending beyond

that time. The delay that this search and the additional discovery could cause after more than three years of litigation would unduly prejudice the defendants' attempts to resolve this lawsuit. Consequently, leave will not be granted to amend the complaint to add the new claims unrelated to SASOL II.

## C. *Addition of Claims Against J. Robert Fluor*

Plaintiff's attempt to amend the complaint to add J. Robert Fluor as a party defendant in Count I (failure to disclose) and Count VI (state claims) raises additional problems. Plaintiff offers no convincing explanation as to why it did not act sooner to learn of the participation of Fluor's Chief Executive Officer in the handling of the SASOL II project. In addition, although the claims against him are essentially the same as those made against the corporation, they might create the need for some additional discovery to learn the full extent of his participation. On the other hand, there would seem to be no prejudice or surprise caused by the delay in seeking this amendment, because as President and Chief Executive Officer of the corporation, Mr. Fluor was undoubtedly fully familiar with the pendency of the case and the facts underlying the action.

Ordinarily, under the liberal federal rules, this combination of undue delay but minimal prejudice would probably militate for allowing the amendment to add J. Robert Fluor. Fluor argues, however, that the complaint should not be amended because the claims against J. Robert Fluor are barred by the statute of limitations.

Under Fed.R.Civ.P. 15(c), an amendment changing the party against whom a claim is asserted relates back to the date of the filing of the original complaint if, before the running of the original statute of limitations, the party brought in 1) had such notice of the institution of the action that he would not be prejudiced, and 2) knew or should have known that but for

---

**4.** March 13, 1975 is the date at which effective dissemination of the SASOL II contract fixed.

a mistake concerning the identity of the proper party, the action would have been brought against him.[5] The fact that plaintiff seeks to add an additional party rather than simply "change" parties does not preclude the relation back of the amendment. 3 Moore's Federal Practice ¶ 15.15[4.–2] at 15–224. In this case, however, there was clearly no mistake as to the identity of the proper party, see *Ingenito v. Bermec Corp.*, 441 F.Supp. 525, 553 (S.D.N.Y.1977); consequently plaintiff's claim against defendant J. Robert Fluor cannot relate back to the original filing date of the complaint under Fed.R.Civ.P. 15(c).

This conclusion does not entirely resolve the question of the timeliness of the claim since State Teachers contends that its motion to amend the complaint made on July 13, 1979 was within the statute of limitations applicable to this case. In determining whether a 10b–5 action is timely brought, courts should refer to the statute of limitations of the forum state, including any "borrowing statute" of the forum. *Robertson v. Seidman & Seidman*, 609 F.2d 583, 586 (2d Cir. 1979); *Arneil v. Ramsey*, 550 F.2d 774, 779 (2d Cir. 1977). Under New York's borrowing statute, N.Y.C.P. L.R. § 202, where the plaintiff is a non–resident, an action based upon a cause of action accruing outside the state cannot be commenced after the expiration of the statute of limitations of either New York or the place without the state where the cause of action accrued.[6]

The question of how to determine "where the cause of action accrued" is the subject of much debate. Initially, the Second Circuit analyzed the then undeveloped New York law on the subject and declined to apply New York's modern choice of law rules to make this determination, concluding that the applicable test in a fraud action was the First Restatement formula of where the "economic impact is felt, normally the plaintiff's residence." *Sack v. Low*, 478 F.2d 360, 366 (2d Cir. 1973). *See also Arneil v. Ramsey*, 550 F.2d at 780. Since then, the New York Court of Appeals has affirmed an opinion of the Appellate Division that applied New York's choice of law rules to determine where a cause of action accrued under § 202. *Martin v. Julius Dierck Equipment Co.*, 52 A.D.2d 463, 384 N.Y.S.2d 479 (2d Dept.1976), *aff'd*, 43 N.Y.2d 583, 403 N.Y.S.2d 185, 374 N.E.2d 97 (1978). In its opinion the Court of Appeals did not address the Appellate Division's use of a choice of law analysis. Although somewhat ambiguous,[7] the Court of Appeals' opinion has been read to mean that the modern choice of law test should be used instead of the First Restatement formula to

5. Fed.R.Civ.P. 15(c) provides:

 (c) *Relation Back of Amendments.* Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against him, the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him.

6. N.Y.P.L.R. § 202 provides:

 An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

7. In that case the Court of Appeals was concerned primarily with *when* a cause of action accrues rather than *where* it accrues. Because it found that plaintiff would only have a cause of action against a defendant for negligence and strict products liability, and not for breach of warranty, it concluded that as a matter of logic and fairness, the cause of action could not have accrued before plaintiff was actually injured in Virginia. *Martin v. Julius Dierick Equipment Co.*, 43 N.Y.2d at 591, 403 N.Y.S.2d at 189, 374 N.E.2d 97. Having reached that conclusion, the Court of Appeals did what appeared to be a modified interest analysis, and concluded that the law to be applied was that of Virginia, the place of injury. *Id.*

determine where a cause of action accrues under § 202. *See* J. McLaughlin, Supp. Prac.Comm. to CPLR § 202 (McKinney's Supp.1978). *But see Posner v. Merrill Lynch, Pierce, Fenner & Smith*, 469 F.Supp. 972, 978 (S.D.N.Y.1979).

At least in a case such as this, where application of the First Restatement test would mean that the statute of limitations of each class member's residence must be determined and applied, this court chooses to follow the modern conflicts approach, which provides a reasoned means for selecting one statute of limitations applicable to the entire class. *Accord Natural Resources Corp. v. Royal Resources Corp.*, 427 F.Supp. 880 (S.D.N.Y.1977) (using modern conflicts approach in case in which lex loci difficult to determine).

▮ Under New York's modern choice of law analysis some of the factors to consider in determining which state's limitations period to apply are

(i) the place where the actual stock transactions took place;

(ii) the state of incorporation and principal place of business of Fluor and the other defendants; and

(iii) the place where the alleged fraud occurred.

*State Teachers Retirement Bd. v. Fluor Corp.*, 80 F.R.D. 142, 145 (S.D.N.Y.1978). In this case, the major stock transactions known to have been made during this period occurred through Mitchell Hutchins in New York, since it was responsible for selling State Teachers' holdings in Fluor as well as arranging the large block purchase of Fluor stock by Manufacturers. It is likely, however, that some stock transactions took place in California, since Fluor is traded on the Pacific Stock Exchange. Manufacturers is a New York corporation;

Fluor's state of incorporation and principal place of business is California. However, any of the alleged misrepresentations or omissions made by Fluor representatives and the decisions not to disclose originated in California. Any tipping by Fluor to Manufacturers also occurred there. Since the essence of the action occurred in California, and since the places of residence of the class members may be diverse, California has a greater interest than any other state in regulating the conduct that took place there, and its statute of limitations will be applied.

Under California law, § 10(b) and Rule 10b–5 claims are subject to a three year statute of limitations. *Korn v. Merrill*, 403 F.Supp. 377, 387 (S.D.N.Y.1977), *aff'd*, 538 F.2d 310 (2d Cir. 1976). *See also Rochelle v. Marine Midland Grace Trust Co. of N.Y.*, 535 F.2d 523, 531 (9th Cir. 1976). It is not as clear, however, whether under California law a two year, three or four year statute of limitations should apply to a state claim for wrongdoing by a corporate director.[8] *Compare Burt v. Irvine Company*, 237 Cal. App.2d 828, 47 Cal.Rptr. 392, 416 (1965) (2 year statute applies to neglect by directors, 3 year statute applies for active wrongdoing to corporation in the nature of fraud), *with Korn v. Merrill*, 403 F.Supp. 377, 387 (S.D. N.Y.1975) (four year statute applies to breach of fiduciary duty against investment advisor). *Accord Schneider v. Union Oil Co. of California*, 6 Cal.App.3d 987, 86 Cal.Rptr. 315 (1970) (dictum). The plaintiff argues that it has alleged a breach of duty in the nature of a constructive fraud, and that the three year statute applies. This court agrees that since the state claim is framed in terms of wilful recklessness, that the statute of limitations relating to fraud should govern this action.

---

**8.** Cal.Civ.Proc.Code § 339 provides in pertinent part that the limitation period is two years for

 An action upon a contract, obligation or liability not founded upon an instrument of writing . . .

Cal.Civ.Proc.Code § 338(4) provides that the limitations period is three years for

 An action for relief on the ground of fraud or mistake. The cause of action in such case

not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake.

Cal.Civ.Proc.Code § 343 provides that

 An action for relief not hereinbefore provided for must be commenced within four years after the cause of action shall have accrued.

■ While the law of the forum determines the *length* of the limitations period, federal law determines *when* that period begins to run. *Arneil v. Ramsey*, 550 F.2d at 780. The classic rule is that the time begins to run when "in the exercise of reasonable diligence" plaintiff should have discovered the alleged fraud. *Id.* at 781. *See also Robertson v. Seidman & Seidman*, 609 F.2d at 587.[9]

Since plaintiff sought to amend its complaint on July 13, 1979, to avoid being time—barred, plaintiff should not, in the exercise of reasonable diligence, have been able to discover J. Robert Fluor's alleged misconduct before July, 1976. Defendants assert that if plaintiff had acted with due diligence, it would have known earlier than July 1976 that J. Robert Fluor, as Chairman of the Board and President of Fluor, was fully aware of the circumstances and decisions giving rise to this cause of action. Plaintiff claims that it did not become aware that Mr. Fluor had knowledge of the increased trading in Fluor stock and the rumors in the investment community relating to SASOL II until the February 7, 1979 deposition of Paul Etter.

Issues of due diligence and constructive knowledge depend on inferences drawn from the facts of each case. When conflicting inferences can be drawn from the facts, the question is one for the jury. *See Robertson v. Seidman & Seidman*, 609 F.2d at 591. In this case, it is possible to draw differing inferences from the information available to plaintiff by July 1976. Since the question of when the limitations period should begin to run cannot be resolved until trial, the motion to amend the complaint to add claims against J. Robert Fluor is not barred because of untimeliness.

■ Although the tardiness of the motion is not fatal to it, Fluor also argues that venue does not properly lie in this judicial district as to him, and this court finds this a compelling basis for denying the motion to amend.

Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa reads in part:

Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, . . . may be brought in any such district [wherein any act or transaction constituting the violation occurred] or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

Mr. Fluor has submitted an affidavit stating that he is not an inhabitant of New York, did not transact business there in February–March, 1975 and was not in the state during that time. Plaintiff has not challenged these assertions.

■ The question, then, is whether any act or transaction constituting the violation allegedly committed by J. Robert Fluor occurred in the Southern District of New York. In that regard, "any use of instrumentalities of the mails or other interstate facilities made within the forum district constituting an important step in . . . [the] consummation [of the fraudulent scheme] is sufficient" to establish venue. *International Controls Corp. v. Vesco*, 490 F.2d 1334, 1347 (2d Cir.) *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974), *quoting Hooper v. Mountain States Securities Corp.*, 282 F.2d 195, 204–05 (5th Cir. 1960), *cert. denied*, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961). The act

---

**9.** The test is much the same for when the statute of limitations begins to run on Count VI, the state law claim. Under the terms of the California statute, the cause of action does not accrue "until the discovery by the aggrieved party, of the facts constituting the fraud or mistake." This has been read to mean that the statute begins to run only after the alleged fraud has been discovered, or in the exercise of reasonable diligence, could have been discovered. *Bennett v. Hibernia Bank*, 47 Cal.2d 540, 305 P.2d 20 (1956); *National Automobile & Casualty Insurance Co. v. Payne*, 261 Cal. App.2d 403, 67 Cal.Rptr. 784 (1968) (knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud). *See also Rochelle v. Marine Midland Grace Trust Co. of N. Y.*, 535 F.2d 523, 531 (9th Cir. 1976); *Fuls v. Shastina Properties, Inc.*, 448 F.Supp. 983, 986 (N.D.Cal.1978).

done in the judicial district need not necessarily be fraudulent *per se* to establish venue, *see Mariash v. Morrill*, 496 F.2d 1138, 1144 (2d Cir. 1974), so long as it furthers the manipulative scheme. *See Wilson v. Comtech Laboratories, Inc.*, [1977] Fed.Sec.L. Rep. (CCH) ¶ 96,227 at 92,564 (S.D.N.Y. 1977). *Accord Greene v. Emersons, Ltd.*, [Current] Fed.Sec.L.Rep. (CCH) ¶ 97,267 at 96,886 (S.D.N.Y.1980); *Allegaert v. Warren*, 480 F.Supp. 817, 821 (S.D.N.Y.1979).

In this case, the federal claim against J. Robert Fluor is that he and the Fluor Corporation failed to maintain the secrecy of the agreement with SASOL and knowingly permitted rumors of the contract to circulate in the investment community without disclosing the SASOL II agreement or suspending the trading in Fluor stock. Since there is no evidence that Mr. Fluor was in New York during the critical period, his failure to disclose could not have actually occurred in this district. There is no claim that any mailings or other communications were sent to New York that omitted to disclose this information and would justify placing venue in this district. *See, e. g., Greene v. Emersons, Ltd.*, supra at 96,871; *Zorn v. Anderson*, 263 F.Supp. 745, 748 (S.D. N.Y.1966) (proxy statements mailed into state sufficient to establish venue under § 27). *See also S-G Securities, Inc. v. Fuqua Inv. Co.*, 466 F.Supp. 1114, 1121 (D.Mass.1978) (press releases sent into district sufficient to sustain venue). There is also no evidence that Mr. Fluor used an agent in this district to further this alleged scheme. *See Mariash v. Morrill*, 496 F.2d at 1144 (act of transfer agent in mailing critical dividend from New York sufficient to establish venue).

Plaintiff urges this court to adopt the reasoning of *Black & Company v. Nova-Tech, Inc.*, 333 F.Supp. 468 (D.Or.1971), in which a failure or omission to notify plaintiff of certain information was held to be an "act" within § 27. In determining where an omission "occurred" the court concluded that a liability–creating affirmative act–like a fraudulent representation–"occurs" both in the district where it is transmitted and where it is received. It rea-

soned that a liability–creating omission should be treated the same way, and concluded that an omission "occurs" both in the district in which it should have been transmitted and in the district where it should have been received. *Id.* at 473.

Under this analysis, the plaintiff claims that had defendant properly disclosed the news of SASOL II, it would have been transmitted through New York City because of the city's position in the financial world. Presumably, it would also claim that defendants should have called New York and requested that the New York Stock Exchange suspend trading in Fluor stock. Despite the recognized tendency to construe § 27 liberally, and the belief that a failure to disclose or an omission of a fact constitutes an "act" under § 27, this court finds that such a failure occurs in only one place–where it should have been made. It strains credulity to extend a non–act beyond the territorial limits of its existence. To conclude otherwise in an omission case could logically lead to the conclusion that venue lies in every state where an injured shareholder resides. More important, the venue provision is intended to require some actual contact with the judicial district, and to extend the existence of the nondisclosure beyond California completely contravenes that purpose.

 Finally, it might be argued that venue lies here because J. Robert Fluor is chargeable with the acts of the other defendants. It is true that venue over the person of all the knowing participants in an allegedly fraudulent scheme is proper under the securities laws as long as one of the participants commits an act in furtherance of the scheme in the forum district. *Keene Corp. v. Weber*, 394 F.Supp. 787, 790 (S.D. N.Y.1975). However, this rule is usually applied to cases in which either conspiracies are actually alleged or the other defendants are the intended beneficiaries of the act committed in the district. *See, e. g., Zorn v. Anderson*, 263 F.Supp. at 748. Neither situation applies here since conspiracy is not alleged and the only other knowing partici-

pant named in Count I, the Fluor Corporation, is subject to venue in this district because it transacts business in this state, rather than because of an alleged act it committed here in furtherance of the alleged violation. Consequently, venue does not lie in this district over the claim against J. Robert Fluor and so the motion to amend the complaint to add him as a defendant is denied.

### III. Defendants' Motions for Summary Judgment

#### A. *Count I–Failure to Disclose*

For its first cause of action, State Teachers alleges that under the circumstances of this case, the failure of the Fluor Corporation to disclose the existence of the SASOL II contract or to seek to have trading halted in Fluor stock constitutes a violation of § 10(b) and Rule 10b–5.[10] It argues that even if there were no misstatements or omissions made by the Fluor Corporation and no self–dealing on the part of its officers or employees,[11] because of the rumors in the marketplace and the unusual market activity, the defendant had an obligation to act prior to the time of the announcement of the SASOL II contract on March 10, *i. e.*, during the period of March 4–6.

 A duty to disclose arises from a relationship of trust and confidence between the party with information and the other party to a transaction. *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). The duty typically arises under Rule 10b–5 when the corporate insider desires to trade, and has been described as an alternative duty rather than an absolute one; to disclose or abstain from

**10.** Rule 10b -5 provides

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange.

(a) To employ any device, scheme, or artifice to defraud.

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**11.** Plaintiff did not allege in its complaint that any insider trading occurred, although it attempts to raise such a claim in its memorandum of law. In its 9(g) statement it asserts that at least four Fluor employees or relatives purchased Fluor stock with the benefit of material inside information, without identifying them beyond saying that one was a negotiator of the SASOL II contract and another was a "principal contact" at Fluor regarding the contract. The accompanying exhibits offered by State Teachers indicate that those references are to Hugh Coble, who bought 200 shares of Fluor stock on March 10, 1975, and to Dean Allen, who purchased 200 shares of Fluor stock during the period of February 26–27. Other exhibits indicate that a few additional Fluor employees may have been trading during this critical period.

This court does not view the issue of Fluor's alleged liability for insider trading as being properly before it in light of the plaintiff's failure to plead it or to make any attempt to discuss the legal question it raises. It does not appear, in any event, that plaintiff would prevail on this claim since plaintiff does not mention § 20(a) of the Exchange Act (15 U.S.C. § 78t(a)), the controlling person section, and it does not seem that plaintiff would have a cause of action against the defendants for the self-- dealing of its employees on the theory of respondeat superior.

The Second Circuit has not clearly stated its position as to whether vicarious liability for a § 10b–5 action can be based on a common law theory of respondeat superior. *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 48 (2d Cir.), cert. denied, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). However, the trend seems to be to impose the principles of agency or respondeat superior only where the acts were by high officers within the scope of their duties, *SEC v. Geon Industries, Inc.*, 531 F.2d 39, 49 (2d Cir. 1976), or where a special obligation exists to supervise employees, as in the case of a broker–dealer. *See e. g., Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 885–86 (3d Cir. 1975); *Plunkett v. Dominick & Dominick, Inc.*, 414 F.Supp. 885, 889 (D.Conn.1976) (Newman, J.). *See generally SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 811–13 (2d Cir. 1975); *Lanza v. Drexel*, 479 F.2d 1277, 1299 (2d Cir. 1973). No cases were found in which an employee's trading on his own account was found to be within the scope of his official duties.

trading. *Fridrich v. Bradford*, 542 F.2d 307, 318 (6th Cir. 1976), *cert. denied*, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 769 (1977). *See also Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 236 (2d Cir. 1974). The other situation in which a duty to disclose usually arises is when there has been a previous misstatement of a material fact by a corporation to its shareholders. *See e. g., S.E.C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

It has been suggested that a duty to disclose also exists under § 10(b) in situations not involving self–dealing or prior inaccurate disclosure. *See* Bauman, *Rule 10b–5 and the Corporation's Affirmative Duty to Disclose*, 67 Geo.L.J. 935 (1979); Allen, *The Disclosure Obligation of Publicly Held Corporations in the Absence of Insider Trading*, 25 Mercer L.Rev. 479 (1974). The rationale for such a duty is that § 10(b) is intended to protect the investing public and to secure fair dealing in the securities markets and that a corporation's actions may injure an investor irrespective of whether the corporation itself, or those individuals managing it, are contemporaneously buying or selling the stock of the corporation. *See generally SEC v. Texas Gulf Sulphur Co.*, 401 F.2d at 860–61. A few courts, including the Second Circuit, have indicated that a duty to disclose may exist even in the absence of insider trading or misleading disclosure, but the issue has not been squarely presented. *See, e. g., Goldberg v. Meridor*, 567 F.2d 209, 221 n.10 (2d Cir. 1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978); *Financial Indus. Fund, Inc. v. McDonnell Douglas Corp.*, 474 F.2d 514, 521 (10th Cir.) (en banc), *cert. denied*, 414 U.S. 874, 94 S.Ct. 155, 38 L.Ed.2d 114 (1973). *But see Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 949 (2d Cir. 1969) (corporation not required under § 14 to correct misstatement in press not attributable to it); *Elkind v. Liggett & Myers, Inc.*, 472 F.Supp. 123, 126 (S.D.N.Y. 1978) (corporation has no duty under § 10(b) to correct speculation about its earnings).

Even in the absence of insider trading or prior inaccurate disclosures, this court believes a violation of Rule 10b–5(c) may arise from a failure to disclose where, as here, the rumors are rampant, the price of stock is shooting upward and the defendants are in possession of all the material facts but refrain from disclosing them. In such cases, liability could be imposed only upon a showing that the failure to disclose was motivated by defendants' intent to deceive investors for their own gain, since a wrongful purpose is required to establish liability in a private action under Rule 10b–5.

In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court held that a violation of Rule 10b–5 required a showing of *scienter, i. e.,* "an intent to deceive, manipulate or defraud." *Id.* at 193, 96 S.Ct. at 1381. The Court rejected the argument that there should be liability for wholly faultless conduct that results in harm to investors, *id.* at 198, 96 S.Ct. at 1383, because it found no indication that Congress intended anyone to be made liable under § 10(b) unless he acted other than in good faith. *Id.* at 206, 96 S.Ct. at 1387. It also concluded that the statute did not encompass negligent conduct because § 10(b) so unmistakably implied an intent to proscribe intentional or willful conduct designed to deceive or defraud investors. *Id.* at 199, 96 S.Ct. at 1383.

Some years prior to the decision in *Ernst & Ernst v. Hochfelder, supra*, the courts began to borrow the "business judgment" rule from general corporate law to protect officers and directors of corporations from 10b–5 liability for the exercise of their good faith discretion. The contours of the "business judgment" rule are not well–defined but may be described as a rule that

> the directors and officers of a corporation will not be held liable for errors or mistakes in judgment, pertaining to law or fact, when they have acted on a matter calling for the exercise of their judgment or their discretion, when they have used such judgment and have so acted in good faith.

*Financial Industrial Fund, Inc. v. McDonnell Douglas Corp.*, 474 F.2d at 518. The rationale for the rule is that in order to make the corporation function effectively, those having management responsibility must have the freedom to make in good faith the many necessary decisions quickly and without the fear of potential liability for an honest error in judgment. *Id.*

This reasoning was alluded to in a 10b–5 case when the Second Circuit noted that "the timing of disclosure is a matter for the business judgment of the corporate officers entrusted with the management of the corporation" and that material facts need therefore not necessarily be disclosed immediately. *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d at 850 n. 12. Similarly, in *Financial Industrial Fund, Inc. v. McDonnell Douglas Corp., supra*, the Tenth Circuit held that the corporate decision to issue an earnings statement on a date other than the customary one and the timing of such statement, was a matter of discretion and the exercise of business judgment. 474 F.2d at 518. That court noted, however, that "an undue delay *not in good faith*, in revealing facts, can be deceptive, misleading or a device to defraud under Rule 10b–5." *Id.* at 519 (emphasis added).

The rule that there is no liability for delay in the release of information where it is done in a good faith exercise of business judgment is entirely consistent with *Ernst & Ernst v. Hochfelder, supra*, and its determination that liability cannot be imposed for actions taken in good faith. Plaintiff argues, however, that defendants did not act in good faith, because they were reckless in not releasing this information or requesting the suspension of trading under the circumstances presented here.

Recent Second Circuit decisions have held that reckless conduct will "generally" satisfy the *scienter* requirement. *See e. g., IIT v. Cornfeld*, 619 F.2d 909, (2d Cir. 1980). *See generally Edwards & Hanley v. Wells Fargo Securities Clearance Corp.*, 602 F.2d 478, 484 (2d Cir. 1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980). Moreover, good faith does not constitute a

defense to reckless or intentional conduct. *See Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 46 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978).

A review of the recklessness standards articulated before and after *Ernst & Ernst v. Hochfelder, supra*, reveal that they are generally applied in cases of material misrepresentations or aiding and abetting and that they focus on a defendant's knowledge of the danger that a misstatement is being made or that a scheme to defraud is being implemented. *See, e. g., Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d at 47 (conduct which represents "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that defendant must have been aware of it"); *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1301 (2d Cir. 1973) (en banc) ("reckless disregard for the truth").

This type of analysis is inappropriate in a "timing of disclosure" case, because it focuses the inquiry on the defendant's knowledge of the danger of non–disclosure rather than on whether it pursued the course of non–disclosure with a wrongful purpose. For instance, it is a reality of the marketplace that when management chooses to delay the release of information because it does not know if it has all the facts, or for whatever reason, rumors may circulate, and some speculators may profit from them while some shareholders, ignorant of the rumors, will sell. Under the definitions of reckless conduct which plaintiff asks this court to apply, knowledge of this danger alone, regardless of the reason for non–disclosure, would result in liability.

Such a result is inconsistent with the business judgment rule and the teachings of *Ernst & Ernst v. Hochfelder*, which requires an intent to defraud. As the Supreme Court recently stated in a somewhat different context:

Section 10(b) is aptly described as a catch–all provision, but what it catches must be fraud. When an allegation is based upon nondisclosure, there can be no

fraud absent a duty to speak. We hold that a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information.

*Chiarella v. United States*, 445 U.S. at 235, 100 S.Ct. at 1118.

As has been stated, such a duty would arise in a "timing of disclosure" case upon a showing that defendant acted for its own gain. Although this court believes that something close to intentional misconduct must be shown to establish liability, it need not decide the question of whether some type of reckless judgment would suffice because it finds no evidence that defendants acted other than in good faith.

■ Where the moving party in a motion for summary judgment comes forward with documents supporting its claims, an adverse party may not rest upon mere conclusory allegations. *See SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978). In this case, defendant has produced depositions stating that the publicity delay was required by SASOL as a condition of the contract, and that Fluor had to negotiate extensively to be able to release the information about the contract as early as March 10. Although plaintiff alleges that Fluor intentionally did not seek an earlier date for disclosure because it wanted to make a "big splash" at its annual meeting, it does not point to a shred of evidence that would support an inference that an earlier date could have been negotiated.

■ Having agreed in good faith to the publicity embargo, Fluor complied with it despite its knowledge of the rumors and price fluctuations in Fluor stock during March 4–6, 1975. While the judgment to wait the few extra days after the first rumors were heard before disclosing the award of the contract might be attacked with hindsight, there is no evidence from which the jury could infer that their decision was made with an intent to deceive or defraud investors or with recklessness

amounting to bad faith.[12] Although a jury must be allowed to resolve conflicting inferences that can be drawn from the facts, it should not be permitted to speculate that an evil intent or bad faith may exist in the absence of a single fact which could be said to provide a rational basis for such an inference. This court is unwilling to hold that the very absence of any such facts can be used to establish some casuistical "black hole" to prove an improper intent.

Summary judgment is therefore granted to the defendant.

B. *Count II—Failure to Comply With NYSE Company Manual and Listing Agreement*

For its second cause of action, plaintiff alleges that defendant Fluor's failure to inform the public or the New York Stock Exchange of the signing of the SASOL II contract, or to advise the Exchange of the rumors in the market place and the activity of Fluor common stock constituted a failure to comply with its Listing Agreement with the Exchange and Section A2 of the New York Stock Exchange Company Manual. Plaintiff seems to assert that this failure is a violation of § 10(b) and Rule 10b–5 that caused injury to the plaintiff because the suspension of trading of Fluor stock occurred later than it otherwise would have.

To the extent that plaintiff's complaint frames the second cause of action in terms of a violation of Rule 10b–5, it must be rejected. A claim of violations of the Exchange's rules simply does not take the place of the scienter requirement. *Utah State University v. Bear, Stearns & Co.*, 549 F.2d 164, 169 (10th Cir.), *cert. denied*, 434 U.S. 890, 98 S.Ct. 262, 54 L.Ed.2d 176 (1977). Plaintiff also urges, however, in its memorandum of law, that a private right of action be implied from the defendant's Listing Agreement with the Exchange and the Company Manual.

12. In fact, additional evidence of good faith may be found in the fact that a Fluor representative returned the call of a New York Stock Exchange representative the same day it was made, and indicated at that time that the reason for the activity in Fluor stock might be the award of the SASOL II contract.

There is Second Circuit authority indicating that certain rules of a stock exchange promulgated pursuant to § 6(b) of the Exchange Act may provide a private right of action against members of the Exchange and issuers of securities. *Van Gemert v. Boeing Co.*, 520 F.2d 1373, 1382 (2d Cir.), *cert. denied*, 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975). *Colonial Realty Corp. v. Bache & Co.*, 358 F.2d 178, 181–82 (2d Cir.), *cert. denied*, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966). There is also dictum to the effect that provisions of an Exchange's Listing Agreement and Company Manual may constitute the "rules" of an exchange from which a private right of action can be implied. *See Van Gemert v. Boeing Co.*, 520 F.2d at 1380. Recent case law indicates, however, that the issue of whether a private right of action can be implied from exchange rules is still an "open question" in this circuit. *See Van Alen v. Dominick & Dominick, Inc.*, 560 F.2d 547, 552 (2d Cir. 1977). *See also Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d at 43 n.6; *Wellman v. Dickinson*, 475 F.Supp. 783, 835 (S.D.N.Y.1979).

Assuming, *arguendo*, that a private right of action may be implied from certain rules of a securities exchange, the question then becomes whether such a right can be implied from the rules relied on here. In deciding whether a private right of action exists under a particular rule, a court must look to

> the nature of the particular rule and its place in the regulatory scheme, with the party urging the implication of a federal liability carrying a considerably heavier burden of persuasion than when the violation is of the statute or an SEC regulation. The case for implication would be strongest when the rule imposes an explicit duty unknown to the common law.

*Colonial Realty Corp. v. Bache & Co.*, 358 F.2d at 182. *See also Van Gemert v. Boeing Co.*, 520 F.2d at 1380–81. Recent case law stresses that when implying a private right of action, what ultimately must be determined is whether Congress intended to create the private remedy asserted. *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979); *CETA Workers' Organizing Committee v. New York*, 617 F.2d 926 (2d Cir. 1980).

In this case, the only arguably relevant portion of the Listing Agreement states that "[t]he Corporation will promptly notify the Exchange of any change in the general character or nature of its business." As was the case in *Colonial Realty Corp. v. Bache & Co., supra*, this provision is "something of a catch–all," which does not indicate a Congressional intent to impose a new legal standard. Moreover, unlike the exchange's rule in *Starkman v. Seroussi*, 377 F.Supp. 518 (S.D.N.Y.1974) (Weinfeld, J.), relating to specific activities in which registered representatives may not engage, this rule has "vague or uncertain contours that may lend itself to variant interpretations, so that it could reasonably be argued that it was beyond Congressional purpose that its violation would give rise to a civil claim under federal law." *Id.* at 523. *See also Siedman v. Merrill Lynch, Pierce, Fenner & Smith*, 465 F.Supp. 1233, 1236 (S.D.N.Y. 1979) (precise directive necessary in order to imply right of action). Finally, the language in the Listing Agreement does not apply here, since the award of a contract hardly constitutes a change in the general character of a business.

Although the provisions relating to disclosure in the Exchange's Company Manual are more specific, this court also finds that a private right of action may not be implied from its language. Section A2 provides for disclosure by listed corporations of any information which might reasonably be expected to materially affect the market for its securities. It also states that the corporation should be prepared to make immediate announcement of important corporate developments if unusual market activity occurs prior to its announcement (A–20). It notes, however, that "[j]udgment must be exercised as to the timing of a public release on those corporate developments where the immediate release policy is not involved or where disclosure would endanger the company's goals .... (A–23)."

A review of the rule in the context of the entire regulatory scheme reveals that Congress and the SEC have already regulated the corporation's disclosure requirements and that section A2 cannot be viewed as a stock exchange "rule which provides what amounts to a substitution for regulation by the SEC itself." *Colonial Realty Corp. v. Bache & Co.*, 358 F.2d at 182.[13] For example, a corporation's disclosure obligations are governed by § 10(b) and Rule 10b–5 as well as by certain requirements under the Williams Act, and it cannot be said that with respect to disclosure requirements that the SEC has decided "to take a back–seat role in its promulgation and enforcement." *Id.* In addition, the requirements imposed specifically recognize that business judgment must be exercised as to the timing of the release where, as here, "disclosure would endanger the company's goals [of securing and keeping the contract]."

■ This raises another issue which although not dealt with directly by the Second Circuit, has received considerable attention by other circuits and the district courts. That is that mere negligent violations of the Exchange rules are not actionable in federal court; rather, to form the basis for liability in damages, the facts alleged must be "tantamount to fraud" on the investors. *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 410 F.2d 135, 143 (7th Cir.), *cert. denied*, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969). *See also Utah State University v. Bear, Stearns & Co.*, 549 F.2d at 168; *Siedman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 465 F.Supp. at 1236; *Birotte v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 468 F.Supp. 1172 (D.N.J.1979); *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 424 F.Supp. 1021, 1041 (S.D.N.Y.1977), *modified on other grounds*, 570 F.2d 38 (1978), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1979);

*Carroll v. Bear, Stearns & Co.*, 416 F.Supp. 998, 1002 (S.D.N.Y.1976). As this court reads plaintiff's second cause of action, which alleges that Fluor failed to comply with the New York Stock Exchange's Company Manual and its Listing Agreement despite its knowledge of rumors in the marketplace, plaintiff's claim is for negligence only. Moreover, as already discussed, there is no evidence that the failure to make these disclosures was motivated by a wrongful or fraudulent intent. Because of the failure to allege facts "tantamount to fraud" and the finding that the Exchange provisions cited do not, in any event, give rise to a private right of action, this claim is dismissed as a matter of law.

### C. Count III–Misrepresentations and Omissions of Material Facts

The third cause of action alleged by plaintiff relates to statements made on March 5, 1975 by Walter Russler, Director of Investor Relations for Fluor. Plaintiff claims that upon questioning, Russler told a Reuters reporter that the rise in Fluor's stock price probably reflected anticipation of the company's first quarter earnings report and might also be attributable to the fact that Fluor was "being considered for some major orders." State Teachers also asserts that when Alexander Blanton, a securities analyst from Merrill Lynch, asked about rumors he had heard concerning the award of a large contract to Fluor to perform work in South Africa, Russler denied it. Plaintiff alleges that these comments were misrepresentations and omissions of material fact giving rise to a violation of § 10(b) and Rule 10b–5(b).

Defendant claims, at the outset, that these statements cannot give rise to liability because they could not have been relied upon by investors and therefore were not the cause of any loss to plaintiff or the class

---

**13.** Notwithstanding the dictum in *Van Gemert v. Boeing Co., supra*, this court has serious reservations as to whether a private right of action can ever be implied from the Exchange's Company Manual. In its introduction, the Manual states that it is an attempt to present in reference form methods for publicizing corporate actions and notes that in many matters, any number of factors may necessitate deviation from even the most explicitly stated policy. In right of this disclaimer, it seems particularly unfair to imply a private right of action from the vague contours of the Manual's rules. *See Starkman v. Seroussi*, 377 F.Supp. at 523.

that is actionable under Rule 10b–5. To support its contention, it argues that Blanton did not speak to anyone about his conversation with Russler until after the trading of Fluor stock had been suspended. Fluor also urges that the release of the information given to Reuters did not occur until 2:02 p. m. on March 6, less than two hours before the suspension of trading.

It is undisputed that causation in fact is an essential element of a claim under Rule 10b–5. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Titan Group, Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir.), *cert. denied*, 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975); *Kerrigan v. Merrill Lynch, Pierce, Fenner & Smith*, 450 F.Supp. 639, 643 (S.D.N.Y.1978). Reliance has also traditionally been a prerequisite for recovery in a 10b–5 action, *see List v. Fashion Park, Inc.*, 340 F.2d 457, 462–63 (2d Cir.), *cert. denied*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965), but the Supreme Court has stated that in cases

> involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision [citations omitted]. This obligation to disclose and this withholding of material fact establish the requisite element of causation in fact.

*Affiliated Ute Citizens v. United States*, 406 U.S. at 153–54, 92 S.Ct. at 1472.

*Affiliated Ute* has since been read to mean that the reliance requirement was not abolished, but rather that the court recognized the frequent difficulty of *proving* that the alleged omission was relied upon. *See Titan Group, Inc. v. Faggen*, 513 F.2d at 238. In cases of non–disclosure of material facts ("omission cases"), it is obviously impossible to demonstrate reliance on statements never made and so materiality becomes the decisive element of causation. *Id.* at 239.[14] In cases of actual misrepresentation ("misrepresentation cases"), however, where it can be demonstrated that the injured party relied upon affirmative misstatements, there is no need to dispense with proof of reliance. *See Reeder v. Mastercraft Electronics Corp.*, 363 F.Supp. 574, 581 (S.D.N.Y.1973); Note, *The Reliance Requirement in Private Actions Under SEC Rule 10b–5*, 88 Harv.L.Rev. 584, 589 (1975) (hereinafter "Note"). *See generally Herzfeld v. Laventhol, Krekstein, Horwath & Horwath*, 540 F.2d 27, 33 (2d Cir. 1976); *Weitzman v. Stein*, 436 F.Supp. 895, 904 (S.D.N.Y.1977); *Berkowitz v. Baron*, 428 F.Supp. 1190 (S.D.N.Y.1977) (reliance test whether misrepresentation was "substantial factor" in securities activities).

The Second Circuit has stated that a showing of materiality creates a "presumption" of reliance in omission cases. *Chris–Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 374 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973). *See also Tucker v. Arthur Andersen & Co.*, 67 F.R.D. 468, 479 (S.D.N.Y. 1975). There have also been indications that the "presumption" may arise in the case of affirmative misrepresentations, at least where there are numerous plaintiffs involved. *See Chris–Craft Industries, Inc. v. Piper Aircraft Corp., supra.* But see *Titan Group, Inc. v. Faggen*, 513 F.2d at 239. What is not clear, however, is whether the presumption is a rebuttable one, *compare Chris–Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d at 400 (Mansfield, J., concurring in part and dissenting in part), *with Greenspan v. Brassler*, 78 F.R.D. 130, 133 (S.D.N.Y.1978); *Sargent v. Genesco*, 75 F.R.D. 79, 85 (D.Md.1977), although there appears to be no strong policy reason for precluding a showing that there was no

---

14. Of course, the materiality standard is no longer what a reasonable investor *might* have considered important, but rather "that there is a substantial likelihood that a reasonable investor *would* consider it important." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). *See also S.D. Cohn & Co. v. Woolf*, 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976).

reliance where it can be demonstrated. *See* Note, *supra* at 598–600.[15]

■ Assuming, *arguendo*, that reliance may be presumed in a misrepresentation case upon a showing of materiality, the case presented here is strong for permitting the rebuttal of any presumption that plaintiff relied on Russler's allegedly material misrepresentation to Blanton. Blanton's uncontradicted deposition testimony states that he did not mention his discussion with Russler to anyone until after the March 7 suspension of trading in Fluor stock, and plaintiff points to no other evidence, direct or circumstantial, from which an opposite conclusion may be drawn. At this stage in the proceedings, the plaintiff is required by Fed.R.Civ.P. 56(c) to set forth "concrete particulars" and cannot merely assert a conclusion without supplying supporting facts in opposition to the motion. *See S.E.C. v. Research Automation Corp.*, 585 F.2d at 33. Since plaintiff has completely failed to meet the requirements of Fed.R.Civ.P. 56(c), this court finds that there is no factual issue as to whether the alleged misrepresentation was disseminated before March 7. If any material misstatement was made during the March 5 conversation, it could not conceivably have been relied upon by plaintiff when it sold its Fluor stock on March 5 and 6. Therefore, summary judgment must be granted to the defendant on this claim.

■ The claim against Fluor arising from the statements to Reuters poses a somewhat more difficult question. It is argued that either an omission or a misrepresentation is involved in the Russler statement to a Reuters reporter that the rise in Fluor might be because of "anticipation of the company's first quarter earnings report" and because the company is "being considered for some major orders."[16] Although plaintiff asserts that the dateline in the Reuters wire story reveals that the story first appeared at 2:02 p. m. on March 5,[17] this court does not find that defendant has raised a "genuine issue" of fact as to the date of its release. The story reports that Fluor was trading at 23⅞, an event that did not occur until March 6. In addition, common newspaper practice is not to use a dateline in a news item unless the story occurred on a day other than that on which it appears, and other copies of Reuter wire stories reveal that the date and time that the story is first released on the wire is put at the *end* of the story. Finally, a caption above the story stated "Fluor Corp. to Report Earnings Later Today" and a later Reuters news item as well as the deposition testimony indicates that Fluor's first quarter earnings report was released on March 6. Consequently, at most the possibility of actual reliance on this alleged omission did not arise until the last two hours of trading on March 6.

15. As the Second Circuit has noted, the purpose of the presumption was to avoid an overly difficult burden of proof. *See e.g. Chris-Craft Industries v. Piper Aircraft Corp.*, 480 F.2d at 374. There was no intention to eliminate the element altogether and there is no indication that Congress intended that persons be permitted to recover damages for misstatements or omissions which caused them no harm.

16. The report on the Reuters financial wire read as follows:

FLUOR CORP TO REPORT EARNINGS LATER TODAY

LOS ANGELES, MARCH 5–THE ACTIVITY IN THE STOCK OF FLUOR CORP PROBABLY REFLECTS THE ANTICIPATION OF THE COMPANY'S FIRST QUARTER EARNINGS REPORT WHICH WILL BE ISSUED TODAY, A COMPANY SPOKESMAN TOLD REUTERS.

FLUOR WAS AMONG THE MOST ACTIVE STOCK ON THE NEW YORK STOCK EXCHANGE TRADING AT 23⅞, UP 1⅝.

THE SPOKESMAN SAID THE RISE IN THE STOCK MIGHT ALSO BE ATTRIBUTABLE TO THE FACT THAT THE COMPANY IS "BEING CONSIDERED FOR SOME MAJOR ORDERS.

THE FLUOR SPOKESMAN NOTED THAT THE ACTIVITY IN THE STOCK WAS 'UNUSUALLY HIGH' AND WAS DUE TO A BLOCK TRADE OF 150,000 SHARES.

17. The inscription "2:02" is handwritten on all copies of the Reuters story, and plaintiff has not contested defendant's position that that represents the time at which the story first appeared on the Reuters financial wire.

Even if the statement concerning a rise in the stock price is construed as a material omission because of its absence of any information concerning the SASOL contract, it seems highly improbable that any reliance by any plaintiffs occurred during the two hour period. This is particularly true as to State Teachers since its sell order had been in since January and the last shares of its Fluor stock were sold on that day, possibly before the story appeared on the wire. Assuming, however, that a material omission was made and that reliance should be presumed during that two hour period, the question then arises as to whether the other elements necessary to establish liability under Rule 10b-5 are present.

In spite of any alleged omission in Russler's statement to Reuters, this case is still primarily one involving the right of management to determine when it will release information. Of course a distinction can be made between the right to maintain such a secret when no statements are issued, and the affirmative obligations that attach under Rule 10b-5(b) when a corporation makes any sort of statement. Nevertheless, it is simply not realistic to say that a corporation may determine when it will release information and then hold it liable when its representatives make comments—as they inevitably will in the normal course of business—that do not mention this information. In this court's view, in order to impose liability for such "omissions" there must be more than an intent not to disclose this information; there must also be proof that the omissions were made with an intent to deceive or defraud investors.

This court finds no evidence of an attempt to defraud investors in the failure to correct the Reuters report and no evidence that defendant was even aware of the appearance of this news story until after the close of trading on March 6. As noted, the defendant's failure to announce the news of the SASOL II award was prompted by a good faith attempt to maintain a secret that it had contractually agreed to. The fact that an incomplete statement was published two hours before the close of trading and was not corrected during that time does not change the conclusion that the necessary scienter to establish a violation of 10b-5 was not present.

### D. Count IV and V—Tipping and Trading

Plaintiff's final claim under the federal securities laws is that Manufacturers traded with knowledge of material non–public information about the negotiation and execution of the SASOL contract. Plaintiff asserts that Fluor representatives told Winterfeldt on February 24 that potential projects in a number of countries, including South Africa, were likely to go in 1975, and that at the first available opportunity after that meeting on March 4,[18] Winterfeldt met with officers of two investment groups at Manufacturers and they both decided to purchase large amounts of Fluor stock based on his recommendation. Plaintiff also alleges that Manufacturers had additional "contacts" with SASOL and Fluor on February 25, 1975 when E. Danson Perin and Bruce Henderson of Manufacturers met with a Fluor representative to review Fluor's financing needs, and on February 26 when John Lyon of Manufacturers' London office met with SASOL in South Africa to determine its financing needs. A one million dollar line of credit was extended to Fluor shortly thereafter, and purchases by Manufacturers of Fluor stock, which had already commenced, increased significantly.

The factual issues clearly raised by the complaint are whether Fluor conveyed material non–public information to Winterfeldt [Count IV] on February 24, 1975, and if so, whether such information was conveyed to the Manufacturers' investment officers, who purchased the Fluor common stock during the critical period [Count V].

---

18. In its response to Manufacturers' 9(g) statement, plaintiff disputes the statement that during the week of February 24 certain portfolio managers at Manufacturers purchased Fluor stock for Manufacturers without any consultation with Winterfeldt. Plaintiff has not offered any argument, affidavits or exhibits to the contrary, however, so it is assumed that State Teachers is not pursuing this avenue as part of its claim for relief.

It is not clear from plaintiff's complaint and 9(g) statement whether it is also alleging that Lyon, Perin and Henderson gleaned material inside information from their "contacts" with Fluor and SASOL. If so, its failure to allege with particularity what non–public information was conveyed to Manufacturers and not disclosed by it violates Fed.R.Civ.P. 9(b), and justifies the dismissal of any such claim. *See* section II(B), *supra*.[19] In any event, plaintiff has offered no evidence that any of these Manufacturers representatives learned who was awarded the SASOL II project through these "contacts." The affidavits and exhibits it offers reveal that Henderson's report of his meeting with Fluor relate to a discussion of Fluor's financing of a project in Mexico (Pl.Ex. 21). Lyon's memorandum describing the February 26 discussion with SASOL about its new project reflects that the identity of the contractor was not yet known (Pl.Ex. 1). The letter confirming the loan made to Fluor indicates that it was of a general nature to support Fluor's issuance of commercial paper. (Pl.Ex. 22). In addition, there is no evidence that any of these Manufacturers representatives had any contact with Manufacturers investment officers during this period.

The Winterfeldt meeting at Fluor's offices on February 24 is of a different nature. Plaintiff has offered Winterfeldt's notes from that day which indicate that he was told that a $2 billion coal gassification project "could go" in South Africa in 1975 (Pl.Ex. C). His later notes entitled "digest" lists under the heading "possible work" the entry "South Africa–2.0 billion coal gassification." Defendants have offered the depositions of Manufacturers investment officers who were present at the March 4 meeting with Winterfeldt at which Fluor was discussed, and they seem to indicate that the possible award of the SASOL II contract was not mentioned (Pl.Ex. A, B). ■ Of course, the jury could disbelieve the testimony of the investment officers

and Winterfeldt and find that Winterfeldt did tell them that he had been told by Fluor that a $2 billion coal gassification project "could go" in South Africa that year. Even if this occurred, however, this would not constitute a violation of Rule 10b–5 because it was not material inside information. At most, Winterfeldt could have learned that Fluor representatives were optimistic about the possibility of getting the SASOL II contract, since he met with them a day before they learned from SASOL that Fluor was the actual preferred contractor for the project. The defendants have offered exhibits or affidavits that it was public knowledge that SASOL II was in the planning stages, that Fluor was one of the few companies that could handle the SASOL II project (Manufacturers Ex. 20, 21) and that Fluor had been the contractor for SASOL I. Plaintiff has not offered evidence to refute this claim and this court therefore concludes that the statement by Fluor representatives that a $2 billion coal gassification project in South Africa "could go" or was a "possible project" was not information unknown to other investors. If liability could be imposed for conveying information that can be readily inferred from available public information, then securities analysts would be precluded from speaking generally with corporate representatives. That such a result is not intended by the securities laws is demonstrated by the discussion in *SEC v. Bausch & Lomb*, 420 F.Supp. 1226 (S.D.N.Y.1976), *aff'd on other grounds*, 565 F.2d 8 (2d Cir. 1977). Consequently, defendants' motion for summary judgment on this issue must be granted.

### E. *Count VI–State Claims for Breach of Fiduciary Duties and Fraud*

■ State Teachers' remaining claims are concededly grounded on California law, so that jurisdiction over this count, if any, must be based on the exercise of pendent jurisdiction over the state law claims. *United Mine Workers v. Gibbs*, 383 U.S.

**19.** Moreover, to the extent that plaintiff was attempting to allege a tipping claim against Fluor for these additional contacts, the complaint is inadequate because Count IV specifically limits the tipping claim to disclosures made on February 24, 1975.

715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). In this case, however, where the federal claims have been decided prior to trial, and a substantial commitment of judicial energy has not been put into the state claim, the court should refrain from exercising pendent jurisdiction to avoid a result where "the dog would be wagged by his tail." *Kavit v. A.L. Stamm & Co.*, 491 F.2d 1176, 1180 (2d Cir. 1974), *quoting* Hart & Wechsler, The Federal Court and the Federal System 925 (2d ed. 1973). *See also Allegaert v. Warren*, 480 F.Supp. at 819 n.2; *Omega Executive Services, Inc. v. Grant*, [1979] Fed.Sec.L.Rep. (CCH) ¶ 96,859 at 95,-654 (S.D.N.Y.1979). Consequently, the state law claims are dismissed.

### IV. Conclusion

In summary, this court will permit the amendment of the complaint to add Count II and the other changes to which defendants consent. It finds, however, that summary judgment must be granted to defendants on Counts I, III, IV and V, and that Counts II and VI must be dismissed. Settle judgment on notice within 10 days of the date hereof.

IT IS SO ORDERED.